**614**

## PEDERSEN v. UNITED STATES.
### No. 19316.

United States District Court,
E. D. New York.

June 21, 1954.

See also 120 F.Supp. 399.

Martin M. Kolbrener, New York City, for libellant.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., for respondent.

Martin J. Norris, New York City, advocate.

Olin S. Nye, New York City, for intervenor.

GALSTON, District Judge.

This is a libel against the United States of America to recover for personal injuries suffered by the libellant as a result of a fall from a Jacob's ladder while attempting to board the SS. Pvt. Francis X. McGraw, an Army Transport.

On October 5, 1948, the libellant was employed as captain of oil barge Seaboard No. 55, owned and operated by Seaboard Shipping Corporation. At about 7:30 o'clock that morning, the Seaboard No. 55 was towed alongside and made fast to the McGraw for the purpose of delivering 5,500 tons of fuel oil ordered by the respondent for the vessel. At the time, the McGraw was moored at Pier 14, Staten Island, bow-in, port side to the north side of the pier. The Seaboard No. 55 was brought by a tug to the starboard side amidship of the McGraw and made fast on the offshore side of the vessel, stern-in.

A Jacob's ladder was hanging over the side, about amidship, on the starboard side of the McGraw. This ladder was constructed of steel chain uprights with wooden treads or rungs about six inches wide. As the Seaboard No. 55 approached the McGraw, this Jacob's ladder was hanging down about even with the surface of the water. By the time the oil barge had been brought alongside, the ladder had been pulled up by some member of the vessel's crew. How high from the deck of the oil barge the Jacob's ladder was after it was thus taken up is a sharply controverted question.

The libellant came on deck of the barge about 8:00 o'clock. By this time, the barge had already been made fast to the McGraw. Libellant and the mate of the Seaboard No. 55 then went about the task of securing the hose for pumping the bunker fuel into the McGraw and also the hose for the steam used in pumping the fuel aboard. The steam was furnished by the McGraw, and the rate of pumping was controlled by regulating the steam pressure from the McGraw. The two men handled the hoses on the barge, while members of the crew of the McGraw did the work required in taking them aboard the vessel and securing them to their connections thereon.

After receiving word from the McGraw that the connections had been made, and adjusting the valves aboard the barge in readiness for the pumping to begin, the libellant went to the cabin of the barge for breakfast and to change his clothes preparatory to going ashore, off-duty. When he came on deck again he noticed that the stern breast line from the scow was chafing on the main deck railing of the McGraw. Pedersen stated that he and his mate shouted up to the McGraw for five to ten minutes for somebody to take a heaving line so they could put another line out to take the place of that breast line. Having got no response from the vessel, the libellant decided to climb up on the McGraw himself to take the heaving line from his mate. He testified that the Jacob's ladder which was hanging down the McGraw's starboard side was then about six to eight feet above the deck of the barge. He procured a wooden ladder of the Seaboard No. 55 and propped it up against the side of the McGraw. At the time, there was a space of about two or three feet separating the starboard side of the McGraw and the starboard side of the Seaboard No. 55.

Pedersen described the deck as a rivet deck, i. e. of steel plate. He placed the bottom of the ladder so as to rest against the edge of the plate, a raised edge of about an inch and a half. He then climbed the wooden ladder to reach the foot of the Jacob's ladder. It is his testimony that he climbed seven or eight rungs of the wooden ladder, then placed his left foot on the lowest rung of the Jacob's ladder and put his weight on the ladder to see that it was secure. It held, so he transferred from the wooden ladder and began climbing up the Jacob's ladder. He had climbed to within a couple of steps of the railing of the main deck when he felt the Jacob's ladder begin to slip. It slipped downwards several feet, and then stopped with a jerk. The sudden stop threw the libellant off the Jacob's ladder and caused him to fall to the deck of the barge. After the fall and while lying on the barge deck, the libellant noticed that the Ja-

cob's ladder was all the way down to the deck, with a couple of its steps resting on the barge deck.

It is the libellant's testimony that the Jacob's ladder led down from the boat deck of the McGraw. At the time he started to climb the ladder, he noticed that part of it was taken in at the main deck of the vessel, below the boat deck, and it then continued down the side of the McGraw. It is his contention that the part of the Jacob's ladder which was taken in on the main deck had not been properly secured, causing it to slip as he was climbing it. When the slack had been taken up it stopped with a sudden jerk, causing him to fall off. No one saw the libellant fall.

Knute Bolt, the mate of the Seaboard No. 55, corroborated the libellant's testimony with respect to the preparations for pumping the fuel into the McGraw, the chafing stern breast line and to shouting to the vessel for a member of the crew to catch the heaving line. The mate testified to seeing some crew member taking up the Jacob's ladder on the main deck as the Seaboard No. 55 approached the vessel, until the ladder was about seven feet above the surface of the water. He did not see the libellant start his climb or fall from the Jacob's ladder. It appears that after the libellant went for the wooden ladder, a crew member of the McGraw came to the main deck railing. The mate threw him the heaving line, and was making fast the second breast line at the time of the accident. He became aware of the accident when he heard a cry for help, and upon investigating found the libellant on the deck of the oil barge.

The respondent called as a witness Isaac Aguero, a crew member of the McGraw on the day of the accident, who was on watch by the fuel oil line on the main deck of the vessel. He was stationed midship on the main deck, about ten or twelve feet from the Jacob's ladder. It was Aguero who caught the heaving line from Bolt, the mate of the barge, and made fast the second line of the Mc-

Graw. Aguero testified that when he looked over the side of the McGraw at the time he changed the lines, the Jacob's ladder was about twelve or fourteen feet above the deck of the barge. Shortly after securing the line, he heard a noise. He looked down over the railing and saw the libellant lying on the deck of the barge. He also saw the wooden ladder which the libellant had used. At the time, according to Aguero, the wooden ladder was partly in the water between the two vessels, and partly on the barge. However, he does not recall seeing libellant in the act of climbing either ladder. The witness had some difficulty remembering the position of the Jacob's ladder after the accident, which is understandable in view of the time lapse of almost six years. However, as best he could recall, it was in the same place when he looked over the railing and saw the libellant lying on the barge as it was when he had previously looked over and talked to the mate of the barge. He then climbed down the Jacob's ladder with Robert Hamilton, junior engineer on the McGraw, to the deck of the barge. At this time the ladder was all the way down to the deck of the barge.

When Aguero reported the accident to Hamilton, the two went to the railing of the McGraw and looked down to the deck of the barge. The libellant was no longer on the deck, having been helped to the cabin of the barge by his mate. Hamilton noticed the wooden ladder lying on the deck with one of the uprights broken. He estimated this ladder's length to be between 20 and 25 feet. He also stated that the Jacob's ladder was hanging down the side of the McGraw with its lower end about 16 or 17 feet above the deck of the barge.

The deposition of Donald P. Garrido, third mate of the McGraw, on October 5, 1948, was taken by the respondent. He was the watch officer that morning. His testimony, taken April 19, 1954, is that the Jacob's ladder was hanging down from the main deck about six feet above the high water marking of the

McGraw. He estimated the lower end of the ladder to be about 20 feet from the water's edge.

The respondent contends that the libellant's fall did not occur while he was climbing the Jacob's ladder, but rather as he was attempting to climb the straight wooden ladder, which was part of the equipment of the Seaboard No. 55. However, an entry in the rough deck log of the McGraw, dated October 5, 1948, is directly to the contrary. It reads:

"0848—Thorlief Pedersen, master of oil barge Seaboard No. 55 of the Seaboard Shipping Company, Wilmington, Delaware, · fell from ship's Jacob's ladder to deck of his barge."

Respondent argues that even assuming that the libellant fell from the Jacob's ladder, it was not through any fault attributable to the respondent, but solely the result of his own negligence. That the ladder was hanging so high above the deck of the oil barge, as shown by the testimony of its witnesses, as to indicate clearly that there was no invitation to the libellant to use it. On the other hand, there is the libellant's testimony that the Jacob's ladder was only six to eight feet above the deck of the barge. He is corroborated on this fact by the mate of the barge. In this connection there is testimony that the oil barge was drawing about 7 feet 6 inches half loaded as she was at the time, and that when light she would draw about 14 to 18 inches. It was testified that the purpose in hanging a Jacob's ladder about 8 feet above the deck of a barge was to allow sufficient clearance to avoid the ladder being crushed between the sides of the two vessels as the barge rose higher in the water as it discharged its load of oil. As the Seaboard No. 55 would ride about six feet higher when light, a Jacob's ladder about 8 feet above the deck of the half loaded barge would be within easy reach when the barge had completed discharging. The libellant contends, therefore, that the height of the Jacob's

ladder could not be considered as evidencing a denial of any right to use the ladder. With respect to the actual distance from the foot of the ladder to the deck of the barge, it is quite probable that the various figures given (all being approximations only) were a little exaggerated, depending upon the particular interest of the witness concerned. It should be noted too that there is no evidence as to which crew member of the McGraw had pulled up the Jacob's ladder as the Seaboard barge approached the vessel, or whether it had been done under specific orders to raise it so that it could not be used by anybody attempting to climb to the McGraw from the barge.

However, whether the height of the Jacob's ladder could be considered as negativing an invitation to use it, there remains the important question whether there was an affirmative duty on the part of the McGraw to provide a safe means of ingress and egress to crew members of the Seaboard No. 55, which was made fast to the McGraw's offshore side. The work going on was in the McGraw's interest. It is the libellant's testimony that libellant was obliged to board the vessel in connection with this work. Whether the stern breast line was actually chafing there is no evidence to show that it was unreasonable on libellant's part to believe as he did. Moreover, the evidence indicates that another stern breast line was actually made fast between the two vessels because there was concern about the first line. At the time, hoses were attached from the barge to the McGraw through which oil and live steam would pass during the refueling. The parting of a breast line during the refueling operation might well create a hazardous condition if the barge should drift away from the McGraw and cause the hoses to become detached from their connections. In the circumstances the libellant was justified in taking precautionary steps to avoid such a happening. Having first attempted to attract the attention of somebody on the McGraw without success, he was acting in line

with his duties and in the vessel's interest in attempting to board the McGraw.

█ Henry Chilcott, employed by the Seaboard Shipping Corporation in October, 1948, as port captain, testified that it was the usual and customary practice to have a Jacob's ladder down the side of a ship for the men aboard an oil barge to use in the performance of their work. The evidence fails to disclose any other means available on the offshore side of the McGraw to climb aboard other than the Jacob's ladder. It must be concluded, therefore, that the respondent failed in its duty to furnish a safe means for the libellant to climb aboard the McGraw in the course of the vessel's business. Grillo v. Royal Norwegian Government, 2 Cir., 139 F.2d 237.

In all likelihood the accident was caused by the fact that the part of the Jacob's ladder which was taken in on the main deck had not been properly secured or had worked loose, causing it to slip when libellant put his full weight upon the ladder. He stated that he could see that it was secured on the boat deck and that there was slack between the main deck and the boat deck, but that he could not see if it was lashed on the main deck. He also testified that when he first put his left foot on the Jacob's ladder it gave way a little and then stopped.

The evidence also discloses that libellant was carrying an empty canvas bag, about 18 inches long, 8 inches wide and 10 inches deep, as he climbed the ladder. He carried the bag by passing his left arm through the looped handles of the bag, leaving both hands free in climbing the ladder. He admitted, however, that with the bag hanging on his forearm it touched or caught on the uprights of the Jacob's ladder as he climbed the rungs.

█ In contending that he was not negligent in climbing first the wooden ladder in order to reach the Jacob's ladder, which was beyond his reach from the deck of the barge, and then the Jacob's ladder, the libellant argues that an emergency was created by the chafing of the stern breast line. However, there is nothing to show that the emergency thus manifested required the libellant to carry the canvas bag with him as he climbed the ladder. If the bag was for the purpose of bringing back food supplied from shore, as testified to, it would have been easy enough to pull it up with a line after the libellant had reached the main deck of the McGraw. Moreover, according to the evidence, in testing the Jacob's ladder to make sure that it was secure, the libellant, admittedly not knowing whether the slack taken in on the main deck had been lashed down, was still on the wooden ladder and at least 8 feet above the deck of the barge. The wooden ladder was placed to the side of the Jacob's ladder, requiring the libellant to step sideways to mount the Jacob's ladder. Presumably he kept most of his weight on the wooden ladder so as not to lose his balance in the event that the Jacob's ladder did slip. The situation is far different from one where one stands on some solid platform like the deck of the barge, where one's full weight can be safely brought to bear on the ladder in testing it. It would seem therefore, that the libellant's putting one foot on the Jacob's ladder as he did was not an adequate test to determine whether the ladder was secure. Jacob's ladders were not something new to the libellant. Undertaking to climb the ladder, assuming that it had been properly secured and without doing anything to test it other than to put one foot on it, constituted negligence. Mason v. United States, 2 Cir., 177 F.2d 352.

Also to be considered and weighed against the libellant on the question of contributory negligence is his selection of a wooden ladder. There was no explanation given that I can recall of why he did not use other means of seeking to reach the foot of the Jacob's ladder. It is suggested by the respondent, and with some conviction, that a boat hook would have been a safer and more proper means of drawing down the Jacob's ladder. As

against that, however, there is no evidence that there was a boat hook on the scow as part of its equipment. It also must be taken into consideration that the scow was not stationary. There were the ebb and flow of the tide which, to some degree at least, affected its position with respect to the moored vessel. The distance, it is true, was not great—a matter of two or three feet—but nevertheless the barge was not stationary. The use of a wooden ladder in the circumstances certainly suggests a hazard, especially for one who is of the physical proportions and weight of the libellant. Also to be considered is the so-called "emergency" caused by the chafing of the breast line. How imminent a break was, does not appear in the record. Further to be considered in the matter of contributory negligence is the question of whether there was not any other means available to the libellant to arouse some officer or member of the crew of the McGraw. The scow had no engine. We do not know whether it had a whistle or any mechanical means to serve as an alarm, and it is unfortunate that the record is barren in that regard.

It must be admitted, of course, by the respondent that when the pumping operations really started, the chafing of the breast line would present a hazard.

No cited authority reveals the use of a wooden ladder to reach a high suspended Jacob's ladder. However, Bolt, the mate, did testify that "sometimes I had to put up a ladder from the barge in order to get my foot or my head about three feet or four feet above the ladder (i. e. the Jacob's ladder) so that I could step on the first step."

Would not the safer policy have been for the captain to continue calling in the effort to attract the attention of an officer or member of the crew if no mechanical means were available? The mate was successful shortly after.

With respect to the amount of the award, unquestionably the libellant sustained severe injuries. The hospital records, the doctor's report and the x-ray findings indicate that he sustained fractures of several ribs, a fracture of the 12th dorsal vertebra and a herniated intervertebral disc. There also was contusion of the kidney, resulting in a hematuria. The doctors at the Marine Hospital gave an evaluation, on March 22, 1954, of a 20% permanent partial disability of the back. The medical expert called by the libellant, although admitting that it would be difficult to give an exact evaluation, stated that he would accept that made by the hospital doctors. On the other hand, the medical expert called by the respondent testified that, based upon the radiographic findings and subjective complaints exhibited by the libellant, he found a permanent partial disability of about 10%. He also agreed that the matter of determining percentage partial disability of a permanent nature was "in great part * * * a rule of thumb, it is based on experience."

Libellant was pronounced fit to return to duty in September, 1949, and actually returned to work in December, 1949. He has been employed regularly since as a bargeman. At the time of the accident he was earning in the neighborhood of $5,000 a year. He was 34 years of age at the time. His earnings in subsequent years have been about the same or slightly more. However, the testimony discloses that from December, 1949, to date, the libellant has worked as a mate and not as a captain except for a period of ten days, because he lost seniority through being incapacitated. The difference between what he earned and the amount he would have earned as captain, was said to be between $800 and $1000 a year. Of course, the possibility that he will regain the necessary "seniority" to work again as a captain is not ruled out.

Libellant is entitled to the loss of earnings for the period—approximately one year—when he was unable to work because of the injuries sustained. In addition he is entitled to the earnings lost to the date of the trial because his inability to work resulted in a lower rate of pay as a mate instead of as a captain. Libellant's injuries caused pain and suffering, which according to the evidence continues

to the present in some degree. It is libellant's testimony, however, that the pain has not prevented his working as a bargeman. The finding of permanent partial disability with consequent pain if he is required to do heavy lifting or unusually heavy work, as testified to by the libellant's medical expert, indicates that there will be physical discomfort in the future, which in turn might cause some limitation of activity.

■ As Dr. Balenzweig very accurately said, in determining percentage, partial disability of a permanent nature was "in great part * * * a rule of thumb, it is based on experience". So too, there is no mathematical formula which will measure pain and suffering. On the whole the loss of earnings over a year, plus the pain and suffering and the loss of seniority—as to the period that that will continue there is nothing to guide us in the record—it would seem that an award of $15,000 in gross would not be unreasonable. The percentage to be used to measure the contributory negligence involves also a matter of speculation. There should be a deduction of 40% attributable to his own carelessness. The libellant, therefore, is entitled to a decree for $9,000.

The question at issue between the libellant and the intervenor is whether the libellant comes within the coverage of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901, or is outside its coverage as a "master or member of a crew of any vessel" within the meaning of the Act, 33 U.S.C.A. § 902 (3).

Intervenor is the workmen's compensation insurer for Seaboard Shipping Corporation, libellant's employer, and seeks reimbursement for payments made to libellant, without any formal award, in the sum of $1,810.

If the validity of the award were at issue, the administrative finding, on the facts, as to whether the libellant was or was not a "member of a crew" would have to be accepted by the court, if sustained by the evidence. South Chicago Coal & Dock Co. v. Bassett, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732. Here, however, the intervenor is not attempting to set aside the payments made, or to attack the award directly.

The evidence adduced discloses that the libellant, on October 5, 1948, had an ordinary seaman's license, an able bodied seaman's license and the license to handle and man a lifeboat. The libellant's duties as captain of the Seaboard No. 55 consisted of work in loading and unloading oil, painting the boat and keeping it in shipshape condition generally, answering tugboat signals when the barge had a tugboat alongside, anchoring the barge, putting out the lines, tying up the barge, answering navigational signals, and putting out navigational lights. It also appears that the libellant had quarters aboard the barge where he ate, slept and kept his clothes and personal belongings.

The intervenor contends that the primary duty of the libellant was in loading and unloading. No evidence was presented with reference to the procedure followed in loading oil on the barge other than that it was done from some shore station. With respect to unloading, the evidence shows that the libellant's duty was to handle the lines from the ship to be refueled and to see to hoisting the oil and steam hoses of the barge up to the vessel being refueled. The actual pumping operation was controlled by crew members aboard the ship, and all that libellant was required to do aboard the oil barge was to adjust some valves thereon before the actual pumping was started.

Libellant's duties closely resembled those of the bargeman in the case of Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 430, who was considered to be a member of a crew and outside the coverage of the Act. There, the Supreme Court 321 U.S. at page 567, 64 S.Ct. at page 749, set forth his duties as follows:

"Rusin was continuously aboard. He bought his own meals and lived, ate, and slept on the barge. * * * His duties consisted of taking general care of the barge. They included taking care of the lines at docks, tightening or slackening them as necessary; repairing leaks; pump-

ing out the barge; taking lines from tugs; responding to whistles from the tugs; putting out navigational lights and signals; taking orders from the tugboat when being towed; moving the barge at piers by the capstan."

In contrast, in the Bassett case, supra, the lighterman in question performed no navigation duties and did no work while the boat was en route from dock to the vessel to be fueled. Moreover, the lighter on which he worked had no sleeping or eating quarters. There, it was held that the evidence was sufficient to sustain an administrative finding that the employee was not a member of the crew within the meaning of the Act.

■ Considering all the circumstances, therefore, the conclusion is required that the libellant was a member of the crew of a vessel within the meaning of the Act and so excluded from its coverage. Therefore the intervenor is not entitled to reimbursement as provided for in the Act.

Findings of fact and conclusions of law will be filed in conformity with the foregoing opinion.