[Civ. No. 21361.    Second Dist., Div. One.    June 27, 1956.]

CHARLES L. ANDERSON, Appellant, v. W. R. CHAMBERLIN AND COMPANY (a Corporation), Respondent.

George E. Shibley and John T. McTernan for Appellant.

Lasher B. Gallagher for Respondent.

WHITE, P. J.—Plaintiff instituted this action to recover damages for personal injuries allegedly sustained by him while employed as steward and cook on defendants' vessel the "C-Trader," particularly outfitted to transport cargoes of packaged lumber between ports in Oregon and Los Angeles Harbor. At the time of the accident which occurred about 11:30 o'clock on the night of the 28th of December, 1951, the vessel was docked at Wilmington, California, unloading a cargo of lumber.

The complaint contains two causes of action, the first of which is for negligence under the Jones Act (46 U.S.C.A., § 688) for injuries, and the second is for injuries due to the unseaworthiness of the ship under the general maritime law. The material issues framed by the pleadings may be thus epitomized:

In Paragraph V, first cause of action, it is alleged that on the 28th day of December, 1951, plaintiff was a merchant seaman and was employed as such by the defendants in the capacity of cook-steward; and that at all times mentioned in the complaint, plaintiff was in the service of said vessel and the employ of the defendants and was acting within the scope, purpose and duties of such service and employment.

Defendant W. R. Chamberlin and Company in its answer to the foregoing allegations admitted that on the 28th day of December, 1951, plaintiff was a merchant seaman and was employed as such by the defendant in the capacity of cook-steward. The remaining allegations in Paragraph V, hereinabove referred to, were and each thereof was denied.

Paragraph VI, first cause of action, alleges that on the

28th day of December, 1951, at or about the hour of 11:30 o'clock p. m., plaintiff was aboard the "C-Trader," then docked at Wilmington, California; that at said time plaintiff was at a point adjacent to the Number 3 Hatch and next to the crane located between the Number 2 and 3 Hatches of the said "C-Trader"; that the surface of the deck between said hatches was raised above the level of the original main deck of said vessel and was only several inches below the top of the coaming of the Number 3 Hatch; that at said time and place the defendant negligently and carelessly failed to maintain, control and keep said vessel in a safe condition and negligently and carelessly failed to provide plaintiff with a safe place in and about which to work; that such carelessness and negligence are more particularly described as follows: At said time and place there were no safety lines or guard rails around said Number 3 Hatch, there was oil and grease on the raised deck surface and on the rungs of the ladder leading up the aforesaid crane, and there was no hatchtender on the main deck of said vessel giving signals and directions to the operator of said crane; that while plaintiff was at the base of the crane the operator started to swing said crane around; that by reason of the motion of the crane, the slippery surface of the deck and the lack of guard rails or safety lines around the Number 3 Hatch, plaintiff was forced to and did attempt to avoid the crane by hanging onto the ladder ascending it, but plaintiff was unable to maintain his hold thereon because of the slippery condition of its surface, and as a direct and proximate result of the carelessness and negligence of the defendant as aforesaid, plaintiff fell into Number 3 Hatch, thereby suffering severe injuries.

With respect to the allegations in said Paragraph VI, first cause of action, the answer of the defendant admitted that on the 28th day of December, 1951, at or about the hour of 11:30 o'clock p. m., plaintiff was aboard the "C-Trader" then docked at Wilmington, California; and that the surface of the deck between said hatches was raised above the level of the original main deck of said vessel and was only several inches below the top of the coaming of the Number 3 Hatch. The defendant denied each and every other allegation in said Paragraph VI, first cause of action.

In the second cause of action, plaintiff by reference thereto incorporated, *inter alia,* the allegations of Paragraph V of his first cause of action.

In Paragraph II, second cause of action, after setting forth

his presence on the vessel, his location thereon, and the raised condition of the deck surface between the hatches, plaintiff alleges that at said time and place defendant "failed to maintain, control and keep said vessel in a seaworthy condition and failed to provide plaintiff with a seaworthy place in and about which to work; that said unseaworthiness is more particularly described as follows: At said time and place there were no safety lines or guard rails around said Number 3 Hatch, there was oil and grease on the raised deck surface and on the rungs of the ladder leading up the aforesaid crane, and there was no hatchtender on the main deck of said vessel giving signals and directions to the operator of said crane; that while plaintiff was at the base of the crane, the operator started to swing said crane around; that by reason of the motion of said crane, the slippery surface of the deck and the lack of guard rails or safety lines around the No. 3 Hatch, plaintiff was forced to and did attempt to avoid the crane by hanging onto the ladder ascending it, but plaintiff was unable to maintain his hold thereon because of the slippery condition of its surface, and as a direct and proximate result of the unseaworthiness of said vessel as aforesaid, fell into said No. 3 Hatch, thereby suffering the injuries hereinabove described."

The answer of the defendant to the second cause of action admitted the allegation that on the 28th day of December, 1951, at or about the hour of 11:30 o'clock p. m. of said day, plaintiff was aboard the "C-Trader" then docked at Wilmington, California; and the allegation that the surface of the deck between said hatches was raised above the level of the original main deck of said vessel and was only several inches below the top of the coaming of the Number 3 Hatch. The answer denied each and every other allegation in Paragraph II, second cause of action.

As a separate and special defense defendant alleged as follows: "The plaintiff negligently, carelessly and unnecessarily went to a part of the defendant's vessel where a revolving crane was actively engaged in the discharge of cargo and plaintiff negligently, carelessly and unnecessarily placed himself in close proximity thereto and negligently, carelessly and unnecessarily took hold of a ladder attached to said crane and negligently and carelessly caused himself to be carried by said revolving crane over an open Hatch and said negligence, carelessness and unnecessary conduct on the part

of the plaintiff proximately caused and proximately contributed to any injury sustained by him.''

The cause was tried before a jury which returned a verdict for defendant. From the judgment entered upon such verdict plaintiff prosecutes this appeal.

Since the key issue at the trial and on this appeal is whether plaintiff was injured ''in the course of his employment'' and because plaintiff relies only on the contention that the trial court committed prejudicial error in its instructions upon that issue, we deem it unnecessary to narrate in detail the factual background surrounding this litigation except insofar as it will prove enlightening in the determination of the single issue tendered to us.

We have carefully examined the summary of the evidence furnished by defendant in some 90 pages of its brief as well as the reporter's transcript and are satisfied that the ''Statement of the Case'' prepared by plaintiff, together with excerpts from defendant's summary, presents a fair epitome of the testimony necessary for a determination of the issue raised on this appeal.

Plaintiff's evidentiary statement follows:

''Between the forepeak at the bow and the house at the stern, extended the main deck of the 'C-Trader.' This deck covered three cargo holds numbered one, two and three, from forward to aft. The hatches for each of these holds were unusually large, leaving only about five feet of deck space from the port and starboard hatch coamings to the ship's sides. Between the number three and number two hatches, as well as between the number two and number one hatches, was situated a circular crane containing its own motive power and capable of rotating in a complete circle. The space between hatches numbered three and two was 59 inches, and the diameter of the number two crane was estimated at eight feet. Thus, the crane protruded over the forward coaming of number three hatch and the aft coaming of number two hatch.

''During unloading operations, the narrow space between the ship's side and the hatch coaming of the number three hatch was, as a matter of usual practice, filled to the top of the hatch coaming with the components of the hatch covering. This was the situation at the time of appellant's injury. Part of the structure of the hatch coaming was a steel beam, called a stiffener, along which crew members could walk when the deck space was filled with the hatch covering.

''In the area between the number three and number two

hatches, and on either side of the number two crane, was a platform. This was raised above the deck to a level only a few inches below the top of the hatch coamings. From its starboard end to port end the platform was 34¼ feet long. In width it was the distance between the hatch coamings or 59 inches. There was testimony that the platform was ordinarily used by the crew in going to and from the crane. On December 28, 1951, when plaintiff was injured, there was no guard rail along the edges of this platform at the forward edge of the number three hatch or the aft edge of the number two hatch.

"The state of emptiness of the number three hold at the time of appellant's injury is indicated by the photograph marked Exhibit 5. The entire area of the number three hatch, that is, between the number two crane and the 'house,' was fully illuminated.

"The number two crane had a large cylindrical portion which housed the electrical motors and hydraulic machinery that provided its motor power. Below that was a flat circular structure which was the base of the crane. This was stationary and had a track on its upper side upon which the entire crane structure above it rotated. Just above the motor portion of the crane was the operator's cab. It rotated with the crane, as did the boom, so that the operator always faced the tip of the boom.

"The number two crane had two ladders going up from the platform to the crane operator's cab. The lowest rung was affixed to the stationary base and did not move; one was on the port side and one on the starboard. The upper rungs were attached to the motor part of the crane and of course rotated with it. When the boom pointed along the keel of the ship, the upper rungs were aligned over the stationary rung.

"The galley, mess rooms and unlicensed crew's quarters were situated in the 'house' on the level of the main deck. In the deck above were the officer's staterooms, including appellant's. The open deck at this level was the boat deck. There were ladders, on the port and starboard sides, from the boat deck to the main deck.

"The vessel was moored port side to on the night of the accident.

"The cables coming off the boom of the crane culminated in a blacksmith which consisted of a hook and a heavy metal ball to carry the cables down into the hold. The hook at-

tached to the loads of lumber. The witness Dragoun was operating the number two crane when Anderson was hurt. His general description of the crane operation was this:

"The lumber was prepared in stacks or packages with slings around them. The hook of the blacksmith was passed through the eyes of the sling and the load was then lifted from dock to hold or vice versa by means of the crane. The crane rotated in a complete circle on its own axis, and the boom could be raised or lowered. In discharging cargo the crane operator worked in conjunction with a deck hand in the hold. The latter indicated the next load to be moved and the crane operator then lowered the blacksmith close enough to permit the deck hand to hook on. Before lifting, the crane operator would center the blacksmith laterally over the load to prevent its swing when it was free in the air. The load was then lifted out of the hatch, and, by a combination of rotating the crane and either raising or lowering the boom, it was passed over to the dock and deposited at a point indicated by the longshoreman. When the blacksmith was brought back empty from the dock, the crane operator rotated the crane so as to bring the boom in line with the center line of the ship and lowered into the hold. As the blacksmith neared the cargo, the crane operator rotated the crane and lowered or raised the boom sufficiently to bring the blacksmith to the next load as indicated by the deck hand.

"During the entire loading or unloading operation the operator's whole attention was fixed on the hook or blacksmith. He sat facing the blacksmith, and as the crane rotated the cab moved with it so that the operator continued to face the blacksmith at all times. While watching the blacksmith, the operator could not observe the movement of people on the deck or on the raised platform between the hatches, and he could not see behind him.

"However, it was regular procedure in the vessel for crew members, while loading and discharging operations were going on, to move about on the deck and to climb up the ladder on the crane. In doing the latter the crew members would wait until the blacksmith was in the hold to be hooked on to the next load. This occurred on the night of December 28, 1951.

"In the loading and unloading operations there was no hatch tender or other person assigned to give the crane operator signals as to when to raise a load or rotate the crane.

"4. Standard and accepted practices in the industry con-

cerning the use of hatch tenders and barriers around hatch openings.

"The witness Giblin, having been properly qualified as an expert, testified to the standard and accepted practices in the Los Angeles Harbor area with reference to the use of hatch tenders in the loading and discharge of cargo vessels and to barriers and obstructions around hatches and other deck openings.

"Concerning hatch tenders, Giblin testified that in December 1951 the standard and accepted practice in Los Angeles Harbor was always to use a hatch tender to work in conjunction with the winch driver. This practice applied to vessels equipped with revolving cranes like those used on the 'C-Trader.' Assuming the presence of the crane operator in a cab affixed to the revolving crane so that the crane turned with the boom (as in the case at bar), the standard and accepted practice obtaining in December 1951 called for the use of a hatch tender in the discharging operations at number three hatch on the 'C-Trader.' In such operations the standard practice is for the crane operator to focus his attention upon the load that he is moving with his crane. Because of this the hatch tender is necessary to warn the crane operator of dangers outside his line of vision. The regular duties of the hatch tender, as the job was performed in the Los Angeles Harbor in December 1951, included being responsible for the safety of any person in or about the working area of the hatch, giving signals, whenever needed, to the crane operator or winch driver, directing the lifting or lowering of loads and warning him of danger to any persons in or about the vicinity of the hatch.

"Concerning barriers around hatch openings, Giblin stated that the standard and accepted practice was to have such a barrier of at least 30 inches. This barrier would normally consist of the hatch coaming. But where that did not provide the minimal protection, guard rails were installed. Having in mind the condition existing on the 'C-Trader' at the platform between the number three and number two hatches, as shown on Exhibits 2, 4, B and F, and in particular the fact that the level of the platform between these hatches was six or seven inches below the top of the forward hatch coaming of number three hatch, and that this platform was used by members of the crew, standard and accepted practice required a railing on each side of the platform as a protection against the open hatch. Since such guard rails would

be on the forward end of number three hatch and the aft end of the number two hatch, they would not interfere with the loading or discharge of cargo at either hatch.

"5. The Accident to Appellant.

"Plaintiff testified that his department performed no work directly connected with the loading and discharge of lumber. It did, however, prepare and serve meals to the deck hands who were so engaged. In addition to the three regular day-time meals, the stewards department was responsible for three night-time meals depending upon the hours worked by the deck department. If the crew worked until nine p. m., the stewards department prepared and served coffee and a cold lunch at that hour. If the work continued until midnight a hot meal was served at eleven o'clock. Should the crew work to three a. m., another cold lunch with coffee was served.

"On December 28, 1951, the deck department began to discharge cargo after the regular daytime dinner. Shortly after six p. m. the second mate told plaintiff Anderson that the crew would work past nine p. m. and that a hot meal should be served at eleven. He testified that he was not told when the crew would stop work for the night. According to his testimony, plaintiff Anderson received no other instructions with reference to meal hours or quitting time that night.

"At eleven p. m. the crew did not appear for the hot meal. When they had not come in by eleven-fifteen, Anderson thought that they were going to work past midnight or that some change had been made in the orders given him by the mate. If the crew were going to work past midnight Anderson's department would be responsible for preparing the three a. m. meal as well as the regular breakfast and other daytime chores. This would have made it necessary for Anderson so to arrange the work assignments in his department that the night-time meals would be readied and hands would be available for breakfast and the tasks of the day.

"Accordingly, according to his testimony, Anderson went in search of the mate on watch to ascertain the crew's quitting time and his consequent responsibilities for the balance of the night. So purposed, he ascended from the galley to the boat deck and thence to the starboard ladder to the main deck. This took him to the offshore side of the vessel. From the boat deck, and while descending the ladder to the main deck, Anderson was able to see the area of the number three hatch and the entire length of the main deck. He observed

no one. He looked down into hatches three and two and found no one in either. He then went to the platform between these two hatches. Up to that time he had seen no one anywhere on deck.

At this point Anderson determined to speak to the crane operator, Roy Dragoun, in an effort to get the information he sought. He walked along the platform toward the crane. When he was about one step from the crane, he called out 'Hey Roy' to the crane operator. The boom of the crane was pointed aft, in line with the keel of the ship, and the operator was facing aft. As he did this Anderson noticed the crane operator, who was leaning forward in his cab, look around to the starboard side, which was the side Anderson was on. At that point Anderson took hold of the ladder with both hands and stepped with one foot on the stationary rung. He looked up, calling 'Hey Roy' again. At that instant the crane was rotated, carrying Anderson out over the open hatch. He was unable to maintain his grip and he fell into the hold, a distance approximately as indicated in Exhibit 5.

"From the time Anderson walked on the stiffener along the number three hatch and while he was on the platform between the two hatches, he heard no one call out to him in any way. There was no railing along the sides of the platform.

"A deck hand, the witness Price, saw Anderson out on the main deck just before he was hurt. Price stood on the port side of the boat deck where he had a view of the number three hatch and the number two crane. He estimated that he had been there one or two minutes before he saw Anderson and the total time he was in that position was not more than five minutes. In the entire interval up to the time the crane moved with Anderson on the ladder, the crane did not move.

"Price first saw Anderson when the latter was close to the forward part of the number three hatch, starboard side. Anderson stopped there momentarily and then walked to the crane. Price's attention was drawn to Anderson by his white apron and shirt. Price saw Anderson's left hand on the ladder and left foot on the stationary rung. Then the crane rotated and Anderson was 'swung off' into the hold.

"Price saw no one between the house and the number two crane while Anderson was at that hatch and the crane.

"The crane operator, Roy Dragoun, testified that he did not see plaintiff until he had fallen into the hold. Dragoun

had the blacksmith 'down at the bottom' in the hold where a deck hand was hooking on a load. Dragoun's attention was riveted on the blacksmith. He had brought it 'just a little to the port side of the keel line'. After the load was hooked on, he moved the boom about two feet clockwise or to port in order to center the blacksmith over the load. At this point he heard the third mate yell, 'look out'. He looked and saw Anderson sprawled on the lumber in the hold.

"Before hearing the words 'look out,' Dragoun heard other voices hollering. He does not recall hearing the words 'Hey Roy'. When he heard these voices he 'might have turned from left to right to see who was hollering.' But he has no recollection about it one way or the other.

"Following the accident Dragoun was relieved. He descended the ladder on the starboard side with the boom pointed aft, thus using the same ladder Anderson had grasped and fallen from. Dragoun found oil on the rungs. This was apparently a chronic (not a transitory) condition that frequently came about from the oil used in the hydraulic machinery in the motor part of the crane.

"Aside from inconsistencies and possible impeachment, there is but one substantial conflict in the evidence. Respondent's witness Hardie, the second mate, testified by deposition that he had told Anderson at 10:30 p.m. that the crew would work until midnight. As already noted, Anderson denies receiving any instructions after approximately six p.m. and then that the hot meal was to be served at eleven p.m. There is no conflict in the evidence concerning the absence of a hatch tender, the lack of guard rails along the sides of the platform and the presence of oil on the rungs of the ladder."

In support of its contention that plaintiff was not injured in the course of his employment, defendant points out that the former's employment required him to prepare breakfast, lunch and dinner every day and therefore, as a matter of law, it was not necessary for him to mount the crane ladder on the night in question to obtain any information as to the usual daily meal routine for the day following. That regardless of whether the deck crew ceased work for the night at midnight on December 28, 1951, or resumed work at 1 a.m. on December 29, 1951, and quit at some time thereafter or continued all night, the steward's department was in any event required to be on the job to take care of breakfast, lunch and supper on December 29.

That the evidence shows without conflict, including appellant's testimony, that the so-called "11:00 o'clock" hot meal was served as 11 p. m. only if the loading or unloading operation ceased at that time; that there was no regularity with respect to serving the "11:00 o'clock" hot meal at 11 p.m. That it was, however, always served at whatever time the deck crew ceased work after 11 p.m. up to and not later than 12 o'clock, midnight. That plaintiff testified that there was a variation in the time at which the "11:00 o'clock" meal would be served; that it was "never served regularly"; and that "the 11:00 o'clock meal was served whenever the deck department was going to work past 9:00 o'clock and up to 12:00 o'clock"; and that if the men worked past 12:00 o'clock (midnight) and up to 3 a.m. there was a 3 o'clock coffee time. The hot meal was loosely referred to as the "11:00 o'clock hot meal" but was served at whatever time the work of the deck department stopped between 11 p.m. and midnight.

That according to plaintiff's testimony the second mate told him at about 6:05 p.m. "that they were going to work past 9:00 o'clock and to have a meal ready for 11:00 o'clock" but was not told "by him (2nd mate) at what hour the crew would stop work for the night." That plaintiff knew, according to his own testimony, that the hot meal was never served at 11 p.m. unless the deck crew stopped work for the night at 11 p.m., and that if the work continued after 11 p.m. he would be required to serve the "11:00 o'clock" hot meal at some time between 11:00 p.m. and midnight, and in any event not later than midnight regardless of whether the work of unloading was or was not to be resumed at 1 a.m. or was to continue up to 3 a.m.

That plaintiff had finished all of the preparations for the "11:00 o'clock hot meal" with the single exception of frying the eggs, before he left the galley. That there is absolutely nothing connected with frying eggs which would require the plaintiff to know the exact minute, between 11 p.m. and midnight, at which the deck crew would start coming into the crew's mess room. That it therefore was unnecessary, as a matter of law, for appellant to be informed with respect to that element. That he never fried the eggs until the deck department crew members actually came into the crew's mess room. They had not appeared up to 11:15 p.m. That he got to the starboard ladder leading from the boat deck to the main deck at about 11:28 p.m., two minutes before he

took hold of the crane ladder (the accident having occurred at about 11:30 p.m.).

That he therefore had actual knowledge, without seeking information from anybody, before he left the galley, that the "11:00 o'clock" hot meal was not going to be served at 11 p.m., and would have to be served not later than midnight. That there is no testimony that plaintiff required any information in addition to that already within his actual knowledge in order to prepare or serve the "11:00 o'clock" hot meal at the time he left the galley. He had actual knowledge when he went out on deck, that the deck crew was then discharging lumber. He, therefore, as a matter of law, had actual knowledge when he was on the boat deck, about two minutes before 11:30 p.m., that the work of unloading the vessel was still going on, but that such work would be stopped some time between 11:28 p.m. and midnight, and that the "11:00 o'clock" hot meal would have to be served whenever the unloading operation was stopped, but not later than midnight. That plaintiff did not require any information from the second mate or anyone else to enable him to know that the "11:00 o'clock" hot meal "dead-line" or zero hour was 12 o'clock midnight in view of the fact that the deck crew was still engaged, to his actual knowledge, at about 11:28 p.m., in the discharging of lumber.

That plaintiff testified that his reason for leaving the galley shortly before the accident was to look for the mate on watch "to find out what time the crew was going to knock off and to find out if they were going to work until 3:00 o'clock." That it was not necessary for plaintiff to know before the "11:00 o'clock" hot meal was actually served, whether or not work would be resumed at 1 a.m. and would continue up to 3 a.m. That the contractual relationship between defendant and the steward's department required the said department to prepare and serve the 3 a.m. cold lunch if the unloading was resumed at 1 a.m. and continued up to 3 a.m. The members of that department knew, before midnight, that they would have to perform this duty if the contingency arose. "That there is no testimony relating any facts showing the slightest logical reason or necessity for appellant to know before midnight whether the 3 a.m. contingency was then a probability, excepting to serve his own convenience."

That plaintiff's actual reason for wanting to know, before the serving of the "11:00 o'clock" hot meal, what time the unloading operation would be stopped for the night is obvious

and is shown by his testimony that he had brought his wife to the ship at 8:30 p.m. and had her waiting in his quarters for him to get through work because he intended to go home with her that night. That he knew he could not go home with her until after the actual serving of and cleaning up following the "11:00 o'clock" hot meal, but he did not know whether or not he would be required to be on duty at 3 a.m. on December 29, 1951, to prepare and cause the serving of a 3 a.m. cold lunch. That he obviously would not have gone home with his wife after finishing the serving of and cleaning up subsequent to the "hot meal," which work would have commenced at midnight, and thereafter come back to the ship in time to prepare and serve the 3 a.m. cold lunch in the event his duty required him to do so. That if he had been told before serving the midnight hot lunch that he would be required to be on duty at 3 a. m. the next morning he would not have kept his wife on board the ship waiting for him to get through work. That he would have sent her home in a taxicab, the same means of transportation which had been used for getting her from home to the ship at 8:30 p.m.

In view of the foregoing, plaintiff contends that the defendant shipowner failed in its duties in these respects:

1. It failed to assign a person to the number three hatch to serve as hatch tender and perform the functions of warning persons in the vicinity of the hatch and signaling the crane operator when to set the crane in motion, contrary to standard practice in the industry.

2. It failed to provide a guard rail at the sides of the platform between the number three and number two hatches, particularly along the forward side of number three hatch, contrary to standard practice in the industry.

3. It permitted oil to accumulate on the ladder rendering it difficult to maintain one's grip on the ladder.

Plaintiff's position is that when he went out on deck in search of the mate to ascertain the information he assertedly needed, Anderson was acting in the course of his employment. That when he failed to find the officer on watch he then turned to seek information, on the same subject and for the same purpose from the crane operator. That in so doing Anderson continued to act in the course of his employment. That it was therefore the duty of defendant to use due care in providing Anderson a safe place in which to perform these functions as well as its duty to provide a seaworthy ship and appurtenances for this purpose.

Urging that the main issue for the jury was whether he was in the course of his employment when he was injured, appellant complains that his efforts to have that issue submitted to the jury on the theory that he was so engaged if he "was doing things incidental to his employment and acting in the interest of the ship" were thwarted by the court in giving certain instructions.

Appellant concedes that the court at his request gave the following instructions:

"Plaintiff's Instruction No. 4.

"You are instructed that an employee is engaged in the course of his employment whenever he is engaged in the transaction of any business which has been assigned to him for attention by his employer or whenever he is doing any reasonable thing which his contract of employment expressly or impliedly authorizes him to do and which may reasonably be said to have been contemplated by that contract as necessarily or probably incidental to the employment.", but insists that its effect was nullified by certain instructions given at respondent's request. Our attention is directed to the following two instructions:

"Defendant's Instruction No. C.

"The law imposed upon the defendant the legal duty of seeing to it that any place where the plaintiff was required to go in the performance of his work was reasonably safe for that purpose. The law did not impose upon the defendants any legal duty to make any and every place which a seaman-steward might conceivably select for the purpose of finding a mate or as a means of ascertaining when work was going to stop. The mere fact that a particular place aboard a ship is physically susceptible or possibly adaptable to a particular use as a means of enabling a seaman-steward to talk to a crane operator does not impose upon the employer of the seaman a legal duty to make such place reasonably safe for the seaman-steward. Where a place of work actually furnished by the employer is reasonably safe and reasonably suitable for the purpose for which it was intended, a servant cannot hold his master liable for personal injuries resulting from the inappropriate, unauthorized, unnecessary, careless, improper or unusual use of some other place or appliance not furnished or intended for the purpose for which a seaman-steward is using it at the time of an accident."

"Defendant's Instruction No. E.

"You are instructed that the employer of a seaman-steward is entitled to assume, in the absence of evidence to the contrary, that such seaman-steward will perform the work he is called upon to do in the manner in which such work is done by ordinarily careful seamen-stewards, and such employer of a seaman-steward is also entitled to assume, in the absence of evidence to the contrary, that such seaman-steward will perform his work in a place which is reasonably safe and suitable for the purpose if such reasonably safe place of work has actually been furnished by the employer. The employer of a seaman-steward is not required to anticipate that such seaman-steward will not do his work in a reasonably safe place, if such reasonably safe place has been furnished, or that such seaman-steward will negligently, carelessly or unnecessarily and voluntarily select as a place of work some particular spot or part of the vessel which was not furnished or supplied or intended for the particular use to which such seaman may attempt to put it."

"Defendant's Instruction No. G.

"You are instructed that it is a breach of an employer's duty to order a seaman-steward to perform certain work and to do such work in a particular place which is not reasonably safe. It is an entirely different thing when the employer has furnished a place which is reasonably safe and from which the required work can be done with reasonable safety. In such cases the employer's duty to exercise reasonable care to furnish a reasonably safe place to work is fully met if the employer has supplied a reasonably safe place and method of making the work reasonably safe."

"Defendant's Instruction No. J.

"You are instructed that there was no legal duty imposed upon the defendant to make crane number 2 or any part of it reasonably safe for plaintiff's use unless the plaintiff has proved by a preponderance of evidence that the said crane was supplied by the defendant as a place of work for the use of plaintiff as distinguished from members of the deck department or that the nature of plaintiff's duties necessarily required him to use the ladder of the crane as a place of work or that the plaintiff was required by an order given by an officer of the vessel directing the plaintiff to use the ladder of the crane as a place of work or that the ladder of the crane was customarily used by members of the steward's

department for that purpose, with the knowledge or consent of the defendant.''

''DEFENDANT'S INSTRUCTION No. K.

''You are instructed that the Jones Act does not impose upon the employer of a seaman-steward any duty to provide a place of work that is unqualifiedly safe. All that is required by the law, in this respect, is that the employer exercise reasonable care to make the place where the particular seaman-steward is required or knowingly permitted to work reasonably safe.''

''DEFENDANT'S INSTRUCTION No. D.

''You are instructed that if you find from all of the evidence in this case that the proximate cause of plaintiff's injury was a voluntary and unnecessary act of stepping upon the stationary rung attached to the base of the crane and grasping a rung of the ladder affixed to the revolving part of the crane and that the plaintiff's duty as a seaman-steward did not require him to assume such position for the purpose of finding the mate on watch or of ascertaining when the work of unloading the C-Trader was scheduled to stop for the night hot lunch or that there were other absolutely safe means and methods of ascertaining where the mate was or when the work of unloading the vessel was scheduled to stop and that the use of the stationary rung attached to the base of the crane by a seaman-steward such as plaintiff was not a required or necessary act in the performance of any duty required of him in the ordinary course of his employment as a seaman-steward and that such stationary rung and the rung of the ladder were not furnished or intended for the use of a seaman-steward for the purpose of finding the mate on watch or of ascertaining when the work of unloading was scheduled to stop when there was no duty imposed by law upon the defendant to make such appliance reasonably safe for such use by the plaintiff.''

''DEFENDANT'S INSTRUCTION No. 12.

''You are instructed that the mere fact that a chief steward employed aboard a vessel as such happens to be injured while he is aboard the vessel does not prove by a preponderance of evidence or otherwise that he was injured in the course of his employment. A chief steward aboard a vessel such as the ''C-TRADER'' is not necessarily authorized to go to any or every part of the vessel and in order to show that his presence at any particular part of the vessel was in

the course of his employment he is required to prove by a preponderance of evidence that the performance of his duties as chief steward required him to be in said particular part of the vessel."

Two other instructions were given to the effect that unless appellant proved by a preponderance of the evidence that he was required to take hold of the ladder attached to the revolving part of crane Number 2 in order to ascertain where a mate was or when the unloading operations would be stopped, the jury should find that appellant was not acting in the course of his employment in grasping the ladder. That if the jury found appellant was not acting in the course of his employment, and that in the performance of any duty of a chief steward he was not required to place himself in the position he did immediately prior to the accident, then appellant was not acting in the course of his employment and as to the first cause of action a verdict should be rendered in favor of respondent. In the second instruction the jury was advised that if they found that appellant, *"without any order or direction from any officer of the vessel to do so,* voluntarily and unnecessarily undertook to use the ladder of the number 2 crane to hold onto it and lean back to talk to the crane operator; that such ladder under the circumstances existing at the time of the accident, was not furnished or intended to be used by the plaintiff for the purpose and that there was at said time available to him a free and unfettered choice of a reasonably safe way of accomplishing his object, and if you further find from the evidence that the plaintiff, without any order or direction to do so, voluntarily, negligently, and unnecessarily chose an unsafe way of attempting to accomplish his object, and that he was injured as the sole proximate result of his own voluntary and unnecessary choice or of a negligent choice in attempting to accomplish his object in an unsafe way, then the defendant is not liable to the plaintiff for damages by reason of personal injury . . .". (Emphasis added.)

It is appellant's contention that by these instructions the jury was advised that the respondent ship owner's duty to provide for the safety of the crew was operative only as to those places on the vessel where the crew member is "required" to go. That the foregoing instructions informed the jury that the crane could not be considered a work place for appellant unless, (1) it was supplied as a work place to him by defendant; (2) Anderson's duties "necessarily re-

quired" him to use the ladder as a place of work; (3) an officer ordered Anderson to use the crane as a place of work; or (4) the crane was customarily used by a member of the stewards department as a place of work, with the knowledge or consent of defendant. Appellant earnestly asserts that by these instructions the jury was told that a seaman injured as the result of a negligently maintained condition aboard ship does not suffer "injury in the course of his employment" (46 U.S.C.A., § 688) unless the injury occurs at the seaman's work place; that according to the instructions, work place is the "required" location for the performance of assigned tasks. Appellant urges that because of the multitudinous perils created by complex machinery and the vagaries of the sea as well as other special conditions of employment on shipboard, the concept of negligence as used in the Jones Act is far broader than that used in the relation of employer and employee on land. The answer of respondent to the foregoing is thus epitomized by it: ". . . appellant was not at all required to use the crane ladder as a perch from which to attract the attention of the crane operator or to hold a conversation with him, it is also established without conflict that he was using the ladder for a purpose for which it was not furnished or intended. . . . The sole proximate cause of the appellant's injury was his 'inappropriate, unauthorized, unnecessary, careless, improper' (*Vileski* v. *Pacific-Atlantic S.S. Co.*, 163 F.2d 553) and unusual use of the rung attached to the stationary base of the crane and the ladder attached to the crane housing."

In the case of *Rouchleau* v. *Silva*, 35 Cal.2d 355, 361 [217 P.2d 929], our Supreme Court held, "The term 'negligence' as used in the Jones Act is given a liberal interpretation, and includes any conscious or careless breach of the employer's obligation to provide for the safety of the crew (*Koehler* v. *Presque-Isle Transp. Co.*, 141 F.2d 490, 491). An established duty falling on employers of seamen is that they shall use due diligence to provide their employees with a safe place in which to work, and *in this respect a higher standard is required of them than of employers of workers on shore* (citing cases)." (Emphasis added.) (See also *Socony-Vacuum Oil Co.* v. *Smith*, 305 U.S. 424 [59 S.Ct. 262, 83 L.Ed. 265]; *Jamison* v. *Encarnacion*, 281 U.S. 635 [50 S.Ct. 440, 74 L.Ed. 1082]; *Alpha S.S. Corp.* v. *Cain*, 281 U.S. 642 [50 S.Ct. 443, 74 L.Ed. 1086].) That the duty arises in all

circumstances when "the shipowner or his agents should reasonably have anticipated the danger of bodily injury to a member of the crew" was the holding in *Sundberg* v. *Washington Fish & Oyster Co.*, 138 F.2d 801, 803, and *McDonough* v. *Bucheye S.S. Co.*, 103 F.Supp. 473, 476.

■ In construing "course of employment" the courts do not, as contended by respondent, confine it to the performance of assigned duties at a "required" place, but on the contrary, the holding is that a seaman "is considered to be in the course of his employment if engaged in any matter incidental to his required duties" (*Sundberg* v. *Washington Fish & Oyster Co.*, *supra*, p. 803). ■ For the purpose involved in the case at bar, a seaman is at his place of work when he is at a place on or off the ship for "a purpose connected with his employment" by the shipowner (*States S. S. Co.* v. *Berglann*, 41 F.2d 456, 457). ■ The test as to whether the seaman was acting in the course of his employment would seem to be whether at the time in question he is acting "in the vessel's interest" (*Wong Bar* v. *Suburban Petroleum Transport*, 119 F.2d 745, 746; *Nowery* v. *Smith*, 69 F.Supp. 755, affirmed 161 F.2d 732; *Pedersen* v. *United States*, 122 F.Supp. 614, 618, affirmed 224 F.2d 212).

Involved in determining whether appellant was acting in the course of his employment two questions are presented, (1) what was he doing at the time of his injury, and (2) the location, away from his regular work place, of the spot where the injury occurred. From an examination of the cases we are satisfied that the evidence in the case at bar, under proper instructions would support a finding that appellant was within the course of his employment. It is respondent's contention that appellant herein cannot recover because his injury was the result of his being at a place where he was not required to be in the performance of his duties as a chief-steward, but the weight of authority would seem to be that a seaman is entitled to recover so long as he was not at a place on the vessel where he was forbidden to be. The tenor of the foregoing instructions given in the case now under consideration is that appellant cannot recover unless he was "required" to be at the place where he was injured. ■ Our view of the law is that though the seaman leaves the place where he performs his primary tasks, if injured, he may recover if he left such a place to do something connected with and in aid of the task assigned to him. (*Thompson* v. *Eargle*, 182 F.2d 717; *Pedersen* v.

*United States, supra; Alden* v. *United States S. B. Emergency Fleet Corp.,* 24 F.2d 159; *Seas Shipping Co.* v. *Sieracki,* 328 U.S. 85, 99 [66 S.Ct. 872, 90 L.Ed. 1099, 1109]; *Badalamenti* v. *United States,* 160 F.2d 422.) These cases are all authority for the holding that a ship's employee is entitled to a safe place to work when he leaves the spot where his primary task is performed to do something connected with and in aid of that task, as was the situation contended by appellant in the present case. There is also a line of cases involving injuries occasioned when work activity was not involved, if what the seaman was doing as part of his personal activities are incidental to his employment or in the interest of his employer (*Sundberg* v. *Washington Fish & Oyster Co., supra,* p. 803; *Wong Bar* v. *Suburban Petroleum Transport, supra*).

█ It is at once manifest that respondent's duty to provide a reasonably safe place for appellant to work and the definition of what was within the course of the latter's employment were unduly restricted by the limited conditions set forth in the foregoing instructions Number J, Number H, and some of the other instructions hereinbefore set forth. In confining the operation of respondent's duty to provide a reasonably safe work place to one of the four situations set forth in defendant's instruction Number J, the trial court prevented the jury from making a finding that respondent's duty could arise under other and additional circumstances alluded to above. Equally contrary to the law applicable to litigation under the Jones Act were the aforesaid defendant's instructions Number D and Number H, wherein the jury was required to find for respondent in the event they determined that appellant chose an unsafe way of accomplishing his object when there was a free choice of a reasonably safe way. It is true that if the seaman's choice of an unsafe way constituted negligence on his part, and the employer was free from negligence, and the negligence of the employee was therefore the sole proximate cause of his injury, he cannot recover. █ However, if the shipowner's negligence created the unsafe condition which the seaman chose to utilize, and therefore the negligence of the shipowner combined with the contributory negligence of the seaman to cause the injury, the latter is not, under the Jones Act, absolutely barred from recovery, but the doctrine of comparative negligence becomes applicable, and the jury is entitled to apportion or mitigate the damages accordingly. █ It

was for the jury to determine from the facts whether appellant was entitled to receive the consideration of the comparative negligence provisions of the Jones Act (*Socony-Vacuum Oil Co.* v. *Smith,* 305 U.S. 424 [59 S.Ct. 262, 83 L.Ed 265]). This doctrine was recognized by our Supreme Court in *Rouchleau* v. *Silva, supra,* pp. 361, 362.

The challenged instructions here precluded the jury from applying the foregoing applicable rules. The cases relied upon by respondent are neither applicable nor controlling. They are cases wherein the shipowner was free from negligence and the seaman's negligence was the sole proximate cause of his injury.

It seems clear to us that under proper instructions the jury could have found that on the night in question, in seeking the mate and in attempting to ascertain the work hours and consequent meal times for the remainder of the night, appellant was engaged in activities which were "incidental to" or "connected with" his required duties or "in the vessel's interest." We are unable to say that a different result would not have ensued had proper instructions been given concerning issues framed by the pleadings and raised by the evidence and therefore, the failure to properly instruct in accordance with the law herein enunciated constituted prejudicial error in this case.

Since the judgment will have to be reversed we deem it unnecessary to consider other questions raised by appellant.

The judgment is reversed and the cause remanded for a new trial.

Doran, J., and Fourt, J., concurred.

A petition for a rehearing was denied July 24, 1956, and respondent's petition for a hearing by the Supreme Court was denied August 21, 1956.