**BADALAMENTI et al. v. UNITED STATES.**
**No. 145, Docket 20430.**

Circuit Court of Appeals, Second Circuit.

Feb. 21, 1947.

J. Vincent Keogh, U. S. Atty., and Kirlin, Campbell, Hickox & Keating, all of New York City (Raymond Parmer and Vernon Sims Jones, both of New York City, of counsel), for appellant, United States of America.

Albert Martin Cohen, of Brooklyn, N. Y., and Harold L. Fisher, of New York City (Solomon A. Klein, of Brooklyn, N. Y., of counsel), for libellants.

Before AUGUSTUS N. HAND, CHASE and FRANK, Circuit Judges.

## AUGUSTUS N. HAND, Circuit Judge.

The libellants Badalamenti and Scagnelli were longshoremen employed by John T. Clark & Sons. They were engaged in loading the Steamship El Oriente, a vessel owned and operated by the United States. This suit was brought in admiralty to recover for personal injuries to the libellants occasioned by falling through open No. 1 hatch which they suffered on November 22, 1943, while on shipboard. At the time of the accident the work of their gang was at No. 2 hatch in the lower tween deck. The accident happened when they left No. 2 hatch and walked forward on the lower tween deck in the direction of No. 1 hatch into which each one of them fell. Badalamenti was the first to fall; Scagnelli followed shortly thereafter. Both No. 1 and No. 2 were cargo hatches between which there was a deck space of 56 feet.

John T. Clark & Son were employed by the respondent under an agreement which required the respondent to "furnish and maintain in good working order * * * necessary lights on wharves, piers and vessels when lights are required due to dark-ness," and to furnish "ropes for falls and dunnage."

Prior to and at the time of the accident, another independent contractor, Chelsea Ship Repair Company, was engaged in sheathing bulkheads and decks with lumber in order to form magazines for carrying ammunition.

The libellants were on board the ship for the first time on Saturday, November 20, and worked from 8 a. m. to 12 noon on the upper tween deck at hatch No. 2. They were engaged in loading lumber for the sheathing. While working on the upper tween deck the libellant Badalamenti saw a chain locker and a big light with a full chain in the bow of the ship on the forward side of hatch No. 1. On that Saturday the carpenters group of the Chelsea Ship Repair Company completed all the work that had to be done by them at hatch No. 1 and hatch No. 2 with the exception of a little work to be done on the bulkhead of hatch No. 2. At 5 o'clock that afternoon the carpenters closed both hatches at the top and upper tween decks but left the hatches open on the lower tween decks. With respect to the covers of hatch No. 1 on the lower tween deck the respondent's witness testified that they were stowed away in piles near the hatch. He further admitted that no light was left there and that no guardrail or ropes were put around the open and unlighted hatch.

The trial court made the following findings which were supported by the evidence:

"Seventh: The libelants returned to work on said ship at 8:00 A. M. on the date of the accident, a Monday, and the accident complained of occurred shortly thereafter. Upon arrival at their place of work on the date of the accident, the libelants were assigned to load at Hatch No. 2 on the lower tween deck. Before proceeding to the tween deck, they took the iron doors, or hatch covers, off the top-most Hatch No. 2 on the upper tween deck, and at that time it was observed that the hatch covers, at Hatch No. 1, on the upper tween deck, were closed.

"Eighth: Due to some difficulty at Hatch No. 2, the gang was compelled to have lowered to it, two skidboards which were

put over the place where the hatch covers should have gone, but did not fit. The skidboards were then tied. It was necessary in the orderly performance of their work, at times, to stand on these skid-boards. At about 9:30 A. M. the first draft was lowered and the libelants and the other members of the inshore part of the gang were waiting their turn to take care of this draft. There was some trouble with the draft because it hit the skid-boards when it came down. It was then found that the skid-boards had a tendency to slide, and for that reason, the men were fearful of standing on them. It was then decided to get some rope in order to pull the drafts in, thus avoiding the danger of standing on the skid-boards.

"Ninth: Daylight was coming into Hatch No. 2, and in addition, two clusters of light, one on each corner of the hatch, provided the light by which the men worked. This light penetrated some 15 to 20 feet toward Hatch No. 1.

"Tenth: The libelant, Jack Badalamenti, decided to walk in the direction of Hatch No. 1 for the purpose of finding the rope necessary to do this work. He fell into Hatch No. 1 which was open, unguarded, and unlighted, and around which there were no hatch combings. The libelant, Paul Scagnelli, who was the header of the gang, missing his coworker, the libelant Jack Badalamenti, proceeded toward Hatch No. 1 to look for him, and fell into the same hatch.

"Eleventh: The distance between Hatch No. 1 and Hatch No. 2 was approximately 50 feet.

"Twelfth: Before proceeding to Hatch No. 1, libelant Jack Badalamenti searched for rope at Hatch No. 2 but could * * * find none. There was rope on the dock, a long distance from the place where the men were working, but due to the fact that war work was being done, and speed was essential, he elected to go toward Hatch No. 1 for the purpose of finding this rope. In walking towards Hatch No. 1, he intended to snap on a chain light which he expected to find in a locker in which rope of the kind needed, was customarily kept on board ship.

"Thirteenth: It is admitted that there was no such light, but libelant Jack Badala-menti saw such a chain light in such a chain locker on the upper tween deck on the Saturday prior to the accident, and therefore reasoned that there must be a similar locker with a chain light on the lower tween deck.

"Fourteenth: It is admitted and conceded that there was a light in such a chain locker on the upper tween deck, as described by libelant Jack Badalamenti.

"Fifteenth: The libelant Jack Badalamenti walked some 15 to 20 feet, it got dark, he stretched out his hand and kept walking, endeavoring to reach for the aforementioned light. He took two or three steps after it actually got dark, before he fell into Hatch No. 1. Before falling, as he kept walking, it got darker, but not absolutely dark. There was a haze in front of him. He expected to find a light as he had seen on the upper deck. Hatch No. 1 was closed on the upper tween deck, and said libelant had a right to expect, in the absence of lights, guards, or combings that Hatch No. 1 on the lower tween deck was closed, and he could not anticipate that Hatch No. 1 on the lower tween deck was left open.

*     *     *     *     *     *

"Twenty-eighth: The libelant Paul Scagnelli knew that the libelant Jack Badalamenti had gone after rope and noticed in which direction he had gone. Libelant Paul Scagnelli knew there was another hatch in that direction but he did not think it possible to go from the hatch where he was working to another hatch, as on other ships that he had worked on, there was a partition between the two hatches.

"Twenty-ninth: The libelant, Paul Scagnelli, went to look for the libelant Jack Badalamenti a short time after he had gone. As libelant Paul Scagnelli walked, it started to get dark; he slowed down and he figured that he would meet a partition. He called for libelant Jack Badalamenti twice, and at the second call, fell into empty space down Hatch No. 1. He took more than three steps in the dark.

*     *     *     *     *     *

"Thirty-second: That the libelant Paul Scagnelli was negligent to some extent, but only to the extent that the libelant Jack Badalamenti's non-return would put him on notice.

"Thirty-third: That the failure of the respondent to perform its duty as libelant Paul Scagnelli had a right to expect it would, the fact that he expected to meet a partition, and the exigencies of the circumstances are factors in the amount of percentage he should be charged with, which percentage so found, must be offset from the verdict to which he would be entitled."

The trial court also held that none of the members of the stevedoring gang, including the two libelants, had been warned of the open hatchway No. 1; that leaving an open hatchway under the circumstances of this case was dangerous, was not a condition which a reasonably prudent longshoreman would foresee and constituted an unreasonable risk of bodily harm to people likely to use that part of the vessel.

Upon the record we have outlined, the trial court found Badalamenti free from contributory negligence and entitled to an award of $21,000. It found Scagnelli had suffered damages for his personal injuries to the amount of $52,000 which, however, should be reduced to $41,600 on account of his contributory negligence that had contributed to the accident to the extent of 20%.

The respondent contends that it was not negligent to have a cargo hatch open when the ship was awaiting cargo and argues that it had no reason to anticipate the presence of Badalamenti in the neighborhood of hatch No. 1 because that place was outside the orbit of his work.

We think it too great a limitation upon the safeguards which ought to be provided for a workman to hold that if he strays about 50 feet from the place in which he is to work, in search of something to aid him in his task, he has no right to a warning of unknown danger or other protection.

Respondent contends that Badalamenti should not have left the place where he was working and have gone about the unlighted portions of the lower tween deck to search for rope to fasten together the boards that were being lowered. But Badalamenti had tried to find some rope at hatch No. 2 and found none and had apparently volunteered to go to the neighborhood of hatch No. 1

to see if there was not some rope in a locker which he supposed was there, for he had seen such a locker on the deck above that had a snap light in it. After he had proceeded 15 or 20 feet, and beyond a point where the light coming from open hatch No. 2 had penetrated, he was of course aware that he was in an area of darkness; nevertheless, he had no reason to suppose that hatch No. 1 was open and that he ran any risk, other than the general one of stumbling against something in the dark, for hatch No. 1 was closed on the deck above. We cannot say that he was likely to encounter any danger in attempting slowly to traverse this passage if, as he supposed, the hatch was not open. Had it not been open he would not have plunged into the open hatch and met the fate which caused his injuries. Under the circumstances the trial judge was right in holding that Badalamenti's fall and injuries arose solely from the negligence of the respondent in not warning the stevedores that there was an open hatch within about 50 feet of where they were to work. We think it was foreseeable that they might have occasion to go to parts of the deck that were not lighted in pursuit of their calling. If they did, the open hatch was a great danger for it was not protected by any guardrail or ropes, or by any coaming sufficient to prevent an accident. It is not reasonable to suppose that stevedores would not be likely to go about the deck where they were working and not to foresee danger to them from an open hatch which was only about 50 feet away. As a distinguished court said in Pioneer S. S. Co. v. McCann, 6 Cir., 170 F. 873, 878: "It is hardly to be expected that men entering or working within a ship's hold will always keep within the exact parts of the hold where their employment, strictly construed, would call them."

The opinion of Judge Woods in The Omsk, 4 Cir., 266 F. 200, supports the view that some warning or protection against an open hatch was required in circumstances like those here, where the open hatch was in the control of the shipowner. See also West India & P. S. S. Co. v. Weibel, 5 Cir., 113 F. 169. It is true that in Long v. Silver Line, Ltd., 2 Cir., 48 F.2d 15, 16, Judge Swan said: "there is no negligence

in leaving open a cargo hatch if the ship is awaiting cargo," and Judge Learned Hand said the same thing by way of dictum in Hardie v. New York Harbor Drydock Corporation, 2 Cir., 9 F.2d 545, 547, relying upon an older decision by this court in The Saratoga, 2 Cir., 94 F. 221. In both Long v. Silver Line, Ltd., and The Saratoga, the libellant had reason to suppose that there might be danger from an open tank or hatch. But here respondent's ship was having magazines installed for carrying ammunition, the upper tween deck hatch No. 1 was covered, and stevedores were likely to be and apparently were misled as to absence of covers on the hatch below.

■ The trial judge held that Scagnelli was guilty of negligence that contributed to the extent of 20% to the accident which he suffered. The theory was that the failure of Badalamenti to return gave him notice that there would be some special danger in following him into the unlighted hold. But Scagnelli had no reason to anticipate an open hatch as a danger to himself or to suppose that it had occasioned Badalamenti's failure to return. Moreover, even if a more deliberate consideration of events might have made Scagnelli apprehend danger to himself, it cannot be said to have been unreasonable or negligent to disregard a somewhat strained caution when going to find a fellow-workman who had disappeared. In Wagner v. International Ry., 232 N.Y. 176, 180, 133 N.E. 437, 438, 19 A.L.R. 1, Judge Cardozo, in reversing a finding of contributory negligence under somewhat analogous circumstances, said: "The risk of rescue, if only it be not wanton, is born of the occasion. The emergency begets the man. The wrongdoer may not have foreseen the coming of a deliverer. He is accountable as if he had. * * *"

Accordingly we hold that Scagnelli was not guilty of contributory negligence to the degree of 20% or to any degree and that he should receive the full amount of damages which the trial court found that he had actually sustained, namely, $52,000.

The decree is affirmed as to Badalamenti and modified as to Scagnelli by increasing the award of the latter from $41,600 to $52,000, and is otherwise affirmed.