## PALARDY v. UNITED STATES et al.

### No. 121 of 1947.

United States District Court
E. D. Pennsylvania.

Jan. 21, 1952.

Freedman, Landy & Lorry, Philadelphia,
Pa., for plaintiff.

536

G. A. Gleeson, U. S. Atty., and Krusen, Evans & Shaw, Philadelphia, Pa., for the United States.

Conlen, LaBrum & Beechwood, of Philadelphia, Pa., for additional respondent.

KALODNER, Circuit Judge.

This is a third party action in admiralty by a longshoreman carpenter employed by a stevedoring company. He is seeking to recover for injuries suffered while shoring up cargo on board the S. S. "Niantic Victory", which he alleges were caused by the negligence of respondents' agents. Libellant originally instituted a civil action against the vessel's general agent, American-Hawaiian Steamship Company. The trial judge in that action directed a verdict in favor of the defendant on two grounds: (a) the general agent could not be held liable for the torts of the vessel's personnel under the rule of Caldarola v. Eckert, 1947, 332 U.S. 155, 67 S.Ct. 1569, 91 L.Ed. 1968; and (b) there was not sufficient evidence of negligence on the part of the ship's personnel to support a verdict for the plaintiff in any event. The Court of Appeals of this Circuit affirmed the judgment of the District Court on the first ground, expressly declining to consider the second. Palardy v. American-Hawaiian · Steamship Company, 3 Cir., 1948, 169 F.2d 619. The District Judge then vacated his original judgment, and dismissed the complaint without prejudice to any claim which the plaintiff might have against the United States as owner of the vessel. This libel was then brought in admiralty under the Suits in Admiralty Act, 46 U.S.C.A. § 742 (1920). The United States has impleaded libellant's employer, Luckenbach Steamship Company, under Admiralty Rule 56, 28 U.S.C. The transcript of testimony and all other evidence introduced in the civil action have been made a part of the record in this case by stipulation of all parties, and additional testimony has been taken.

On the basis of the pleadings, testimony and exhibits submitted to me, I make the following

### Findings of Fact

1. At all times material hereto, the S. S. "Niantic Victory" was owned by respondent, the United States of America, and operated by the American-Hawaiian Steamship Company under a standard form general agency agreement.

2. At all times material hereto, libellant, a resident of Philadelphia, was employed by the impleaded respondent, Luckenbach Steamship Company. His duties consisted of shoring up cargo which longshoremen, also employed by Luckenbach, had stowed aboard the "Niantic Victory" while it was moored to Pier 84, South, in Philadelphia.

3. In the afternoon of June 20, 1946, libellant was assigned by his employer's carpenter foreman, Claire, to shore up cargo in the lower hold of No. 3 hatch. At that time the hatches were open, and libellant worked in natural light. As the loading operation progressed, the longshoremen covered the hatches above the lower hold, thereby shutting out the natural light overhead. Libellant was then furnished with a cluster light to provide illumination while he worked below deck.

4. The cluster light was an electric light on an extension cord some fifty to sixty feet in length. At one end there was a multiple socket with several electric light bulbs; at the other end the cord was fitted with a plug and screw-on collar. The plug made contact when fitted into an inverted outlet on the main deck; but could not remain in place unless the collar was screwed onto the outlet. However, once screwed on, the plug could not come out until the collar was first unthreaded and removed.

5. At about 6:30 P. M., the light which libellant was using in the lower hold was extinguished. He shouted to the other carpenters working in the shelter deck, two decks above, and was instructed by his foreman to come up from the lower hold to the shelter deck, there to assist them in shoring some linoleum cargo, after which he was to resume his work in the lower hold.

6. Since the main deck hatch had been covered, the men in the shelter deck were also working by the light of a single cluster light. The foreman suspended this light through an opening of approximately 2½ by 4 feet, the space left by the removal of

a single hatch board in front of the forward hatch ladder, so that libellant could make his way up from the lower hold to the lower 'tween deck, and thence up to the shelter deck.

7. After libellant had climbed into the shelter deck, he assisted the other carpenters in fencing and shoring up the linoleum, which had been stowed in the wings of the hatch to within three feet of the square of the hatch. The dunnage needed to shore up the cargo was piled on the hatch boards in the square of the hatch. By this time the vessel was almost ready for departure, and it was necessary to work quickly in order to finish the operation before sailing time.

8. After instructing libellant in his duties, his foreman climbed up to the main deck to investigate the cause for the extinguishment of the lower hold light. He found that the plug had been removed from its outlet, which was located at the after end of the hatch on the midship housing. The only persons in the immediate vicinity at the time were members of the ship's crew who were engaged in battening down the hatch. Since the light cord led down into the hold through a space between the pontoon covers, the tarpaulins could not be put on the hatch properly as long as the light was plugged in.

9. A short time later, the light in the shelter deck of No. 3 was extinguished, plunging the deck into total darkness. The carpenters shouted to the men on the main deck, without response, and then libellant said he would fix the light. He proceeded from the starboard side of the hatch where he was working, across the square of the hatch, forward and toward the port side, where the escape hatch ladder was located. In so doing, he fell through the opening in front of the forward hatch ladder (through which he had ascended to the shelter deck), down to the lower 'tween deck, a distance of approximately fifteen feet.

10. Another carpenter, Zuccarelli, then struck a match and made his way up through the escape hatch to the main deck where he found the plug of the shelter deck light lying on the deck, having been re-moved from its outlet, which was located on the masthead housing at the forward end of the hatch. The cord of this light ran down to the shelter deck through the escape trunk. The only persons Zuccarelli found around the main deck hatch were ship's personnel, still engaged in battening down the hatch.

11. It was the responsibility of Captain Kelly, Assistant Port Superintendent for the general agent, to determine the number of gangs of longshoremen which would be required to load the vessel, and where each particular type of cargo was to be stowed. The work being performed by libellant at the time he fell was under the immediate supervision of the carpenter foreman, who was an employee of Luckenbach.

12. Entries in the deck log of the vessel note that preparations for departure were begun at 6:06 P.M.; that No. 3 hold was "finished and covered" at 6:25 P.M.; that the stevedores who loaded No. 3 went ashore at 6:45 P.M.; that libellant fell at 6:55 P.M.; and that the vessel cleared the pier at 7:59 P.M.

13. The two cluster lights in No. 3 hold were extinguished by members of the ship's crew, who removed the plugs from their outlets on the main deck while in the process of battening down the hatch.

14. The extinguishment of the light in the shelter deck was the proximate cause of the libellant's fall and injuries.

15. By reason of the accident, libellant sustained a severe cerebral concussion (which rendered him unconscious or semi-conscious for a period of four days), as well as a fractured skull. In addition, he suffered a separation of the right shoulder joint, an avulsion fracture of the right coracoid process, and two fractured ribs.

16. By reason of the injury to his head, libellant has suffered an appreciable permanent impairment of hearing, taste and smell; and a continuous tinnitus, or humming, in the left ear. He has also suffered frequent headaches, dizziness and fatigue as a result of the fall; but any outbursts of temper, fits of depression, or other so-called "personality changes" that he may have

experienced up to the time of trial do not represent organic changes due to the head injury.

17. Libellant was earning an average of $95.00 per week at the time of the accident. He was totally disabled for a period of fourteen weeks.

18. Libellant was employed as a driver-salesman by the Philadelphia Toilet & Laundry Co. for a period of some 18 years prior to the latter part of 1942. He then obtained employment as a longshoreman carpenter because of a slackening in his own occupation and for "patriotic reasons".

19. Libellant returned to work for Luckenbach fourteen weeks after the accident. He left his job voluntarily a week later and in the early part of October returned to his former job with the Philadelphia Toilet & Laundry Co. He continued in that job for about a year, earning an average of $70.00 a week. He then obtained employment with the Fairhill Laundry where he worked for about two and a half years, earning about $60.00 a week. He then went to work for Thomas Martin for about six months, earning $65.00 a week. He left that job to work for Baldwin's Overall Laundry Co., his employer at the time of trial. His earnings at Baldwin's averaged about $67.50 a week.

20. Libellant is forty-six years of age.

21. Libellant received the sum of $325.00 as compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq. He also received $439.35 for medical services incurred in his behalf, from the additional respondent.

22. Libellant has not suffered loss of earning capacity as a result of the accident.

23. Libellant, on account of his injuries, pain and suffering, past, present and future, and loss of earnings, has been damaged in the total sum of $18,000.00.

## Discussion

■■■ I have found that the light in the shelter deck was extinguished by a member of the ship's crew, and not by one of the stevedores who might have been on board at the time. There was no testimony by anyone who actually saw the plug removed from the outlet, but the evidence presented was more than adequate to support this finding.

Initially, it is significant that two lights leading into No. 3 hatch were extinguished within a period of a half hour, and that the tarpaulins could not have been put on the hatch properly as long as the light in the lower hold was connected, since the wire on that light led from the outlet down into the hatch between the pontoon covers. The light in the lower hold was extinguished first; and Claire, the carpenter foreman, testified that when he went up on deck to reconnect it, the only persons in the vicinity were the seamen covering the hatch. The light in the shelter deck was extinguished approximately twenty-five minutes later. Immediately after that light went out and libellant fell, Zuccarelli, the other carpenter, went up on deck to get help. He testified that he found the plug lying on the deck, and that the only persons then around the hatch were members of the ship's crew, still battening down. This testimony was corroborated by Claire, who was just returning from No. 2 hatch when Zuccarelli notified him of the accident. Dunn, the winchman who was called to No. 3 a few minutes later to help remove libellant from the hold, stated that he did not recognize any stevedores or other Luckenbach employees on the deck thereabouts at that time. Libellant also introduced in evidence a page of the vessel's deck log, which showed that the stevedore gang which loaded No. 3 had been logged ashore ten minutes before the accident occurred. Taken all together, this evidence is conclusive that the plug was removed from the outlet by one of the crew members, who disconnected it while in the process of battening down the hatch.[1]

1. In order to controvert this finding, respondents attempted to introduce the deposition of Luckenbach's timekeeper, to show that there were Luckenbach employees on board the vessel at the time of the accident. The deposition was ruled out because the witness was available to testify; but even if it had been admissible, it would not have affected the finding, in view of the great weight of evidence in favor of it.

Respondents contend that, even assuming that the light in the shelter deck was extinguished by a member of the crew, this would not constitute negligence toward libellant, in the absence of actual knowledge on the part of respondents' agents that he was working there at the time.

I cannot subscribe to this contention. If respondents' agents did not have actual knowledge of libellant's presence below decks, they had reason to know that he might have been there. The deck log of the "Niantic Victory" indicated that preparations for departure had begun at 6:06 P.M., that the hatch covers were put on No. 3 at 6:25 P.M., that libellant fell at 6:55 P.M., and that the vessel cleared the pier at 7:59 P.M. It was established by expert testimony that when a vessel is in a hurry to sail it is not unusual to continue shoring up cargo for some time after the hatches have been closed. There was also expert testimony that linoleum cargo must always be shored up to prevent it from being damaged. Therefore, both the ship's officers and Captain Kelly, who supervised the loading operation for the general agent, should have known that carpenters might well have been working in No. 3 hold while the hatch was being battened down. Respondents are not relieved of liability merely because the carpenter foreman did not expressly inform the men on deck of this fact. See Badalamenti v. United States, 2 Cir., 1947, 160 F.2d 422.

■■■ I therefore conclude that respondents' agents were negligent, and that their negligence was a proximate cause of libellant's fall; but I also conclude that libellant's own negligence contributed to a measurable extent. Libellant was originally working in the lower hold when the light down there was extinguished. After he ascended to the shelter deck and had been working there for a few minutes, the light on that deck was also extinguished. Thus, his work was twice interrupted in this manner within a short period of time. According to the testimony of both men working with him, when the light on the shelter deck went out they shouted to the men up on deck; then libellant swore and proceeded without hesitation across the hatch boards in the direction of the escape trunk. I conclude that he did not act as a reasonably prudent man in so doing.

Libellant contends that he refrained from striking a match to light his way because of the safety regulations he knew to be in effect with regard to open fires in the holds of vessels. Nevertheless, he knew or should have known that there was a hatch board absent in front of the forward hatch ladder, since he had come up through that very opening just a few minutes before. I find that libellant acted without proper regard for his own safety, and that his negligence contributed to his injuries to the extent of 25%. Therefore, in accordance with the admiralty rule of comparative negligence, the measure of recovery to which he would otherwise be entitled will be reduced by 25%. Socony-Vacuum Oil Co. v. Smith, 1939, 305 U.S. 424, 431, 59 S.Ct. 262, 83 L.Ed. 265.

■■■ Respondents have impleaded libellant's employer, Luckenbach, claiming a right of recovery over against the stevedore in the event that liability is found on the part of the vessel. Respondents contend that under the standard form War Shipping Administration stevedoring contract (Warshipsteve 3/1/44 Middle Atlantic), Luckenbach assumed full responsibility for any loss due to respondents' negligence.[2] The identical question was passed upon by the Second Circuit Court of Appeals in Lo Bue v. United States, 1951, 188 F.2d 800. In that case, as in this, the shipowner relied on Paragraph 8 of Part II of the contract, which provides: "While performing the work, the Stevedore shall * * * be responsible for any and all loss, damage or injury * * * arising through the negligence or fault of the Stevedore, its employees, gear or equipment; provided, however, that the Stevedore's responsibility to the Administrator,

2. Respondent also sought contribution under the theory expressed by the Court of Appeals of this Circuit in Baccile v. Halcyon Lines, 1951, 187 F.2d 403.

However, the decision of the Supreme Court in Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., U.S., 72 S.Ct. 277, is dispositive on this score.

War Shipping Administration, for any and all loss, damage or injury * * * shall be limited in dollars to the amount of insurance provided for in Paragraph 9 of this Part II." Respondents interpret this paragraph as a contractual assumption on the part of Luckenbach for any amounts assessed against the shipowner in· this action. I cannot subscribe to such an interpretation.

As was pointed out in the Lo Bue case, Paragraph 8 only binds the stevedore to indemnify the shipowner for loss to the extent that the stevedore is insured against such loss. It therefore becomes necessary to determine what type of insurance coverage the stevedore has. Under Paragraph 9, Part II, of the agreement, the stevedore is required to procure certain types of policies, the premiums on which are ultimately paid by the government under its cost-plus arrangement. Among these is the Standard Workmen's Compensation and Employer's Liability Policy, a copy of which has been stipulated into evidence in this case. It insures Luckenbach "against loss by reason of * * * liability imposed * * * by law on account of * * * injuries" to its employees. The phrase "liability imposed * * * by law" in the policy refers to the liability imposed upon Luckenbach by the various Workmen's Compensation laws of the states in which it conducts its operations, in addition to the Longshoremen's and Harbor Workers' Compensation Act. It does not refer to liability which is merely assumed by agreement. "In other words, unless a third party could recover from (the stevedore) in the absence of contract, there is no insurance coverage and hence there can be no recovery over here." Lo Bue v. United States, supra, 188 F.2d at page 803.

The case of Porello v. United States, D. C.S.D.N.Y.1950, 94 F.Supp. 952, relied upon by respondents, is not in point, since, under the contract involved in that case, the stevedore's responsibility was not limited to risks against which it was insured.

■ With regard to the issue of damages, certain elements thereof have been seriously disputed. I have found that libellant has suffered an appreciable loss of hearing due to the injury to his head. It is true that the evidence on this point was conflicting. An examination of his ears, made nine days after his admittance to the St. Agnes Hospital, revealed no damage to either ear; and there was a notation on his hospital record, under the date of discharge, of "some impairment of hearing previous to accident." However, his record also showed a diagnosis of a ruptured left ear drum upon admittance, and a complaint of constant humming in the left ear shortly after he regained consciousness. Further, the carpenter foreman testified that libellant was bleeding from the ear when he was, picked up; libellant himself testified on· cross examination that he never had any trouble with his ears prior to the accident;. and Dr. Myers, who qualified as an ear, nose and throat specialist, stated that in his opinion both the loss of hearing and the humming were the direct result of the fall.[3] Therefore, upon consideration of the record as a whole, I conclude that libellant should be compensated for a partial loss of hearing in the left ear, and for the tinnitus, or humming, which two neurologists (Dr. Wycis and Dr. Levine) stated can only be completely cured by destroying all hearing in the affected ear.

■ In addition to the physical injuries he suffered, libellant alleges that since the accident he has undergone certain "personality changes", i. e., outbursts of temper and periods of depression, for which he claims indemnity. I cannot include compensation for any such "changes" in the measure of recovery. Respondents' expert witness, Dr. Ornsteen, testified that such behavior on the part of libellant does not represent "organic personality change due to brain cell injury", but rather "a functional reaction * * * on the part of an unstable personality." I have found this testimony credible.

---

3. It is noteworthy that respondents' expert witness, Dr. Donnelly, did not disagree with this conclusion, although he did disagree with Dr. Myers in other respects.

As to asserted permanent impairment of his future earning ability, I find that he has not suffered such impairment. Moving pictures taken of him while working as a driver-salesman in October, 1947, sixteen months after the accident, conclusively established that he was quite as capable of earning a livelihood in that capacity as he was before he was injured. I therefore find that he is not entitled to any damages based upon reduced earning capacity.

Accordingly, I have found that libellant suffered damages compensable by the sum of $18,000.00. This figure has been reduced by 25% or $4,500.00 because of libellant's contributory negligence, leaving him with an award of $13,500.00. Since libellant has already received the sum of $325.00, representing payments voluntarily made by Luckenbach's compensation carrier under the Longshoremen's Act, I have reduced the award by this amount to $13,-175.00.[4] I have not allowed recovery of the $439.35 medical expenses, since they were paid by Luckenbach's insurance carrier.

I state the following

## Conclusions of Law

1. The extinguishment of the light in the shelter deck of the S. S. "Niantic Victory" constituted negligence on the part of the original respondents' agents; and this negligence was a proximate cause of libellant's injuries.

2. Libellant, in proceeding to walk across the 'tween deck space which was in complete darkness and which he knew or should have known was dangerous by reason of the absence of one of the hatch boards, was guilty of negligence, and such negligence contributed to his injuries to the extent of 25%.

3. There was no assumption of liability by the impleaded respondent, by virtue of the contract between the two parties, for

4. However, while I have credited this amount to the decree against the original respondents, I am making no affirmative decree in favor of Luckenbach,

any loss due to the negligence of the original respondents.

4. Libellant is entitled to recover from the original respondents the sum of $13,-175.00.

5. The original respondents are not entitled to any recovery against the impleaded respondent, Luckenbach Steamship Company.

6. The cause of action against the impleaded respondent should be dismissed.

Orders may be submitted in accordance herewith.