**13-0254-cv**
*Barlow v. Liberty Maritime, et al.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT


August Term, 2013

(Argued: November 15, 2013      Decided: March 4, 2014)

Docket No. 13-0254-cv


GEORGE H. BARLOW, JR.,

*Plaintiff-Appellant*,

-v.-

LIBERTY MARITIME CORP., LIBERTY STAR SHIPPING CORP., LIBERTY SUN
CORP., LIBERTY SHIPPING GROUP L.P., LIBERTY SHIPPING GROUP LLC, *in
personam*, THE M/V LIBERTY SUN, HER ENGINES, TACKLE AND
EQUIPMENT, *in rem.*

*Defendants-Appellees.*

Before:
POOLER, RAGGI, AND WESLEY, *Circuit Judges.*


George H. Barlow, Jr. appeals a judgment entered following a jury trial in
the United States District Court for the Eastern District of New York (Viktor V.
Pohorelsky, *Magistrate Judge*) on claims arising out of injuries he suffered while
working aboard the Motor Vessel Liberty Sun. Barlow assigns two errors to the
district court. First he asserts that the district court should have instructed the
jury on the "maritime rescue" doctrine, under which Barlow could only be held

contributorily liable if the jury found his actions were not only unreasonable, but reckless. Barlow also claims that the district court erred in failing to grant his post-trial motion for judgment as a matter of law regarding his "unseaworthiness" claim. We decline to adopt the maritime rescue doctrine and hold that in maritime injury cases, the proper standard of care is that of a reasonable mariner under the circumstances. We also hold that Barlow was not entitled to judgment as a matter of law on his unseaworthiness claim.

**AFFIRMED.**

> RALPH J. MELLUSI, Tabak Mellusi & Shisha LLP, New York, NY (James Michael Maloney, Port Washington, NY *on the brief*), *for Plaintiff-Appellant.*
>
> ELIZABETH A. MCCOY, (Gregory W. O'Neill, Thomas M. Rittweger, *on the brief*), Hill, Betts, & Nash, LLP, New York, NY, *for Defendants-Appellees.*

WESLEY, *Circuit Judge*:

George Barlow started going to sea as a deck hand in 1974. He was twenty-three. In 1986, after working aboard ships for more than a decade, and without ever having attended college, he passed the merchant marine officer's exam, licensing him to serve as an officer aboard U.S. flagged cargo vessels. In 1992 he received his master's license, the merchant marine equivalent of a captain's qualification. Now retired, Barlow never actually took command of a ship, but did spend his whole career at sea aboard various vessels. In March

2

2007, Barlow took a job as third mate on the last of these vessels, the Motor

Vessel Liberty Sun, a 33,000-ton, 738-foot-long cargo ship.

Two months after Barlow took the job, the Liberty Sun steamed up the

Amazon River to the Hermasa floating grain elevator in the port of Itacoatiara,

Brazil.  Feeder barges bring grain, or in this case soy beans, from shore to the

terminal to be loaded onto larger seagoing vessels like the Liberty Sun, which

moor in the river alongside the terminal.[1]

---

[1] As we shall see, this case involves a number of technical nautical terms. We offer a few definitions below to help our lubberly readers.

To "moor" a ship, is to "attach a vessel to a buoy, or buoys" or to "secure a vessel by attaching ropes to positions ashore." C. W. T. Layton, Dictionary of Nautical Terms and Words 229 (Peter Clissold ed. 4th ed. 1994). Aboard ships, ropes or metal cables used for mooring (or any other purpose) are called "lines." *See id.* at 205. A mooring buoy is a buoy "carrying a large ring or shackle, securely moored so that a vessel can be attached to it and ride in safety." *Id.* at 232. To "tie up" a ship is to secure it to a pier or mooring. It is synonymous with "to moor." *See* American Association of Port Authorities, Glossary of Maritime Terms (2013) *available at* http://www.aapa-ports.org/Industry/content.cfm?ItemNumber=1077 (defining "to dock" as "To bring in a vessel *to tie up* at a wharf berth.") (emphasis added).

"Fore" and "aft" are terms for forwards and backwards. Layton *supra* at 145, 10. Aft, can also refer to the rear portion of the ship, *id.* at 10, and "bow" is the forward portion of the hull. *Id.* at 55.

A line "pays out" when it runs out or spools out. *Id.* at 252. For example, if one ship is towing another, the towing ship can increase the distance between the ships by "paying out" additional line. A line can also pay out rapidly or uncontrollably, if, as here, it is under tension and the tension is suddenly released.

On May 21, 2007 the Liberty Sun tied-up alongside Hermasa. To control her fore and aft movement, the Liberty Sun had three lines forward secured to mooring buoys, two lines aft to mooring buoys, and one line off the port quarter,[2] also to a mooring buoy. She also had two starboard breast lines – lines perpendicular to the ship that control distance from the pier – that were married[3] to lines from the shore. Additionally, there was one tug boat on the starboard bow at all times to fend the ship off the terminal.[4]

---

Upon entering port, ships are often secured using multiple lines to more finely control their movement. For example, in tying a ship to a pier, lines that run perpendicular to the ship and the pier ("breast lines"), *id.* at 58, will control the ship's distance from the pier, but may not adequately control its fore and aft movements. Additional lines, that run diagonally, from an aft portion of the ship to a part of the pier further forward, or from a forward part of the ship, aft, may also be used. These are called "spring lines." *Id.* at 328. In this case, the Liberty Sun had breast lines to control her distance from the grain terminal, and various lines from the bow and stern to prevent her from moving forwards and backwards.

[2] The port quarter is the rear left portion of the ship. Arthur Young, Nautical Dictionary 298 (2d ed. 1863).

[3] To marry two lines is "[t]o join [them] together . . . ." Young, *supra* at 253.

[4] Tug boats, or simply "tugs," are used in ports to help put a ship in position for mooring. *See* Layton, *supra* at 369. In this case, the tug was in place to provide an occasional push to the Liberty Sun if she came too close to the grain terminal.

Three days after mooring, at about 5:15 AM, the forward breast line parted. There was no wind or wave action at the time. The only forces acting on the ship were the four-knot current moving from bow to stern[5] and the forward tug. The tug was pushing away from the shore, exactly opposite to the now-parted breast line.[6]

The second mate, Timothy Schloemer, was the watch officer when the line parted. He immediately notified Captain Donald Grosse who instructed Schloemer to assemble the crew and re-attach the line. The Captain also ordered the Chief Engineer to start the engines. Meanwhile, the remaining lines came under additional strain and approximately five minutes after the breast line parted, the starboard bow line parted.

Schloemer noted that the remaining forward lines were also in danger of snapping. He described them as "running against brake[s]." We understand him to mean that the winches used to control the lines were turning as a result of

---

[5] Front to back. Layton, *supra* at 335.

[6] The breast line was pulling the ship in towards the shore and the tug was pushing away from it. Ideally, the two forces would have counter acted each other to keep the Liberty Sun in place. A diagram from the record best captures the ship's mooring configuration. It is included at the end of this opinion.

the increased tension and that the lines were paying out slowly in spite of the fact that the winch brakes were engaged. Schloemer ordered the boatswain to slacken the lines. In the meantime, the rest of the crew began to assemble.

Barlow was the last crew member to arrive on the scene. He was outranked by Schloemer. Nonetheless, Barlow tried to take charge. First, he argued with Schloemer about how best to slacken the line. Schloemer told him that others were dealing with the problem and ordered him to do nothing.[7] Barlow initially tried to get the captain to intervene, but was unable to reach him on the ship's internal telephone system. He then sought to take matters into his own hands, and proceeded to one of the winches that controlled the forward mooring lines.

The standard method for operating a winch is to first start the motor, and next put it in gear. *Only then* does one release the brake, and either pay out or take in line *using the motor* to control the rate at which the line pays out. Barlow

---

[7] Barlow does not dispute that he was told to stand down, but characterizes Schloemer's words to him as a "polite request" rather than an order. Pl. Br. at 23. Directions from an officer to a subordinate in an emergency are not requests, but orders to be obeyed, however phrased. *See* 46 U.S.C. § 11501(5) (permitting ship masters to confine disobedient sailors within the ship and place them on a diet of 1,000 calories per day "until the disobedience ends").

decided to use his own method of operation, which he calls "bumping the brake." Barlow "bumped" the brake handle to loosen the brake's grip on the winch, without first engaging the motor. He hoped that, freed from the brake's grip, the line would slacken and that he would then be able to re-engage the brake. In Barlow's mind, "bumping the brake" was quicker than the standard operation of the winch, and would save him from greater danger by making it unnecessary to reach under the winch – near the dangerously taut line – to engage the motor.

Alas, even the best-laid plans of mariners go awry. After Barlow bumped the brake, the line paid out uncontrollably. As it did, it whipped around the winch and hit him. After the injury, Barlow remained aboard the Liberty Sun for a week, receiving treatment locally. His wound soon became infected, however, and he returned to the United States in great pain.

In November 2008, Barlow commenced this action in the United States District Court for the Eastern District of New York, against his employer, the Liberty Sun *in rem*, and the various entities associated with its ownership, management, and operation, *in personam*. Barlow asserts claims for damages

under a negligence theory and an admiralty cause of action against the owners of "unseaworthy" vessels.

Before trial, and in response to Liberty's contention that Barlow's actions contributed to his own injuries, Barlow submitted proposed jury instructions adopting the Fourth Circuit's "maritime rescue doctrine." Barlow argued that the maritime rescue doctrine applied because he was acting under emergency circumstances and in bumping the brake he was attempting to rescue the ship and crew from the dangers of parting lines. Under Barlow's proposed instruction, the jury would have been required to find that his conduct was "wanton and reckless" before apportioning him any fault for his injuries. The district court rejected this proposal and instead gave an "emergency" instruction. The court instructed the jury to consider the fact that Barlow was in a position where he must act quickly without opportunity for reflection, and that it should

hold him to the standard of a "reasonably prudent [seaman] . . . faced with the

same emergency."  Dist. Ct. Op. at 7 n. 3.[8]

With respect to his seaworthiness claim, Barlow also sought an instruction

clarifying that the mooring lines were part of the ship.  The court rejected this

_____

[8] In full, the court instructed the jury:

> A person faced with an emergency and who acts without opportunity to consider the alternatives is not negligent if he acts as a reasonably prudent person would act in the same emergency, even if it later appears that he did not make the safest choice or exercise the best judgment.  A mistake in judgment or wrong choice of action is not negligence if the person is required to act quickly because of danger.  This rule applies where a person is faced with a sudden condition which could not have been reasonably anticipated, provided that the person did not cause or contribute to the emergency by his own negligence.

> If you find that the plaintiff was faced with an emergency and that his response to the emergency was that of a reasonably prudent seaman, then you will conclude that the plaintiff was not negligent.  If, however, you find that the situation facing the plaintiff was not sudden or should reasonably have been foreseen, or was created or contributed to by the plaintiff's own negligence, or that the plaintiff's conduct in response to the emergency was not that of a reasonable seamen, then you may find that the plaintiff was negligent.

Dist. Ct. Op. at 7 n.3.

10

instruction, because Barlow made this request for the first time mid-trial at the pre-charging conference. The court further found his request unnecessary and concluded that the "jury would reasonably understand from the extensive testimony in the case regarding the ship's use and operation of the mooring lines that they were part of the 'equipment' referenced in the charge." Dist. Ct. Op. at 18.

Following trial in November 2011, the jury returned a verdict for Defendants on Barlow's unseaworthiness claim and, on the negligence claim, apportioned ten percent of the fault to Defendants and ninety percent to Barlow. The jury totaled damages at $446,000.

Following trial, Barlow timely moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) as to his unseaworthiness claim; in the alternative he moved for a new trial under Federal Rule of Civil Procedure 59(a), again requesting his proposed jury instructions. The district court denied these motions by memorandum order on December 26, 2012. Barlow now appeals.

## Discussion

### A. The Negligence Claim

### 1. The Jury Instruction

This case presents us anew with a question that is nearly as old as tort law itself: How does one judge the conduct of a man in physical peril? Barlow asserts that acts of those in danger should be measured in light of the danger and not in spite of it. The exigencies of circumstance may prompt even the coolest heads to miscalculate and do otherwise than they would in calmer moments. In this much, Barlow is correct. Yet, this much does not tell us how to instruct a jury.

Litigants are entitled to a jury instruction on any theory of liability supported by law and the evidence.[9] Here we must choose between two possible standards of care for maritime torts. Under the maritime rescue doctrine, a would-be rescuer, faced with an emergency, can only be held contributorily liable for injuries resulting from his rescue attempt, if his conduct was reckless

---

[9] We review the district court's instructions *de novo* and will order a new trial if the instruction "[misled] the jury as to the correct legal standard or [did] not adequately inform the jury on the law." *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 390 (2d Cir. 2006) (internal quotations omitted).

and wanton. Under the district court's jury charge, a rescuer may be held liable for actions that were merely unreasonable under the circumstances. We adopt the latter.

In the Nineteenth and early Twentieth Centuries, American courts generally assumed that

> liability for risk-creating conduct should not attach unless the person creating the risk had been "at fault." "Fault" was used as a label by which "blameworthy" conduct was admonished; the party "at fault" was forced to pay for injuries he had caused. It followed from this conception of civil responsibility that a person who was himself "at fault" should not be able to recover for his injuries, even if the risk of those injuries had been created by another blameworthy person.

G. Edward White, Tort Law in America: An Intellectual History 164 (2d ed. 2003). We have come to know this as the doctrine of contributory negligence: "In cases where both parties were blameworthy, [courts] let losses lie where they fell." *Id.*

But the doctrine of contributory negligence was a harsh one. An injured plaintiff was unable to recover – and the defendant went unpunished – even if the plaintiff's actions were much less blameworthy than those of the defendant. To mitigate the harshness of this rule, courts developed devices to avoid its application. *See Dole v. Dow Chem. Co.*, 30 N.Y.2d 143, 147-48, 153 (1972); *see also* N.Y. CPLR § 1411.

13

One was the so-called "rescue doctrine." Persons faced with emergencies must act quickly and are prone to mistakes that a jury, with the benefit of hindsight, might consider negligent. Although courts applying the doctrine of contributory negligence may have been willing to deny recovery to a person whose negligence precipitated an emergency, they hesitated before applying it to someone who voluntarily exposed himself to danger in order to rescue others from it. To protect would-be rescuers, courts created the rescue doctrine. Under the doctrine, defendants asserting the defense of contributory fault were required to show that a rescuer acted not just negligently, but recklessly, thus providing additional leeway to claims of rescuers. *See, e.g.*, N.Y. Pattern Jury Instr. Civil 2:41.

In the maritime context, the rescue doctrine is articulated most clearly by the Fourth Circuit in *Furka v. Great Lakes Dredge & Dock Co., Inc.*, 755 F.2d 1085, 1088 (4th Cir. 1985) (*Furka I*) and *Furka v. Great Lakes Dredge & Dock Co.*, 824 F.2d 330, 332 (4th Cir. 1987) (*Furka II*). In the *Furka* cases, a tug owned by the Great Lakes Dredge & Dock Company was engaged in dredging operations on a rough January day on the Chesapeake Bay. The tug radioed for help. The evidence conflicted, however, about whether the call for help indicated that human lives

14

were in peril or that the tug was merely having mechanical difficulties.

Regardless, Paul Furka, one of Great Lake's employees, quickly responded to the

distress call in a small power boat. When he arrived at the tug, the tug's captain

refused to return to shore with him; Furka turned back. On the return journey,

however, Furka's boat took on water and he drowned. His widow then brought

suit. *Furka I*, 755 F.2 at 1087.

At trial the defendant argued that Furka was contributorily negligent both

in assessing the need for a rescue and in executing it. In *Furka I*, the Fourth

Circuit, sitting in admiralty, applied the rescue doctrine. It held that Furka could

not be found contributorily liable unless his rescue attempt was wanton or

reckless. *Furka I*, 755 F.2d at 1088. The court reasoned that

> of all branches of jurisprudence, the admiralty must be the one most
> hospitable to the impulses of man and law to save life and limb and
> property. The best traditions of seafaring men demand that we
> honor attempts to rescue, unless the rescuer acts beyond the bounds
> that even the exigencies of the moment would allow. The wanton
> and reckless standard reflects the value society places upon rescue
> as much as any desire to avoid a total defeat of recovery under
> common law. Law must encourage an environment where human
> instinct is not insular but responds to the plight of another in peril.

*Id.* at 1089 (internal citations and quotations omitted). After a new trial and a

second appeal, the Fourth Circuit held that this standard also applied to a

rescuer's assessment of whether the rescue was required. *Furka II*, 824 F.2d at

332. The Ninth Circuit has explicitly followed *Furka* and the Fifth Circuit has adopted a similar rule. *Wharf v. Burlington N. R.R. Co.*, 60 F.3d 631, 635 (9th Cir. 1995); *Grigsby v. Coastal Marine Serv. of Tex., Inc.*, 412 F.2d 1011, 1021 (5th Cir. 1969).

Barlow would have us, too, adopt *Furka*. As an initial matter, we agree with Barlow that, if *Furka* were the law in this Circuit, it would have been appropriate to give an instruction on its rescue doctrine. Under the *Furka* doctrine, Barlow need not show that there was an emergency that required a rescue, he need only show that he actually believed a rescue was needed and that this belief was not reckless.

Every witness who testified on the matter said that a line under tension has the potential to snap back and kill anyone in its path. Here, a jury could conclude from Barlow and Schloemer's testimony that the lines were about to part. The Captain himself said that the sailors on the forecastle were "at risk" and that this was an "emergency situation." Although some evidence indicates that the danger was subsiding by the time Barlow acted, Barlow's belief that immediate action was required cannot be ruled "reckless" as a matter of law.

16

Accordingly, we find ourselves squarely presented with the question of whether to follow *Furka.*

As noted above, the rescue doctrine originated at a time when contributory negligence was an absolute bar to recovery. *Furka I*, 755 F.2d at 1088-89. But maritime law has long used comparative fault in resolving competing claims of negligence between the injured and the tortfeasor, [10] and today a majority of the states do the same.[11] Under comparative negligence, of course, even a negligent rescuer can recover, as Barlow did here. Consequently, the principle justification for the rescue doctrine – encouraging rescue – has largely disappeared. Under the reasonable person standard and comparative negligence, rescuers can be confident that even if they misstep, the emergency will be taken into account, and even if, under that circumstance, a jury finds their actions unreasonable, they will not necessarily be denied any recovery. Not surprisingly, then, the majority

---

[10] *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 431-32 (1939). The abrogation of the contributory negligence defense in admiralty has a venerable pedigree. As early as the Seventeenth Century, in cases of collisions at sea, where both parties were at fault, damages were divided evenly. *See The North Star*, 106 U.S. 17, 20-22 (1882).

[11] 1 Comparative Negligence Manual § 1:1 (3d ed.).

rule in comparative negligence jurisdictions is that rescuers must act reasonably under emergency circumstances. 57B Am. Jur. 2d Negligence § 1015.[12]

We find no authority within our case law to support the application of the maritime rescue doctrine and our few holdings in this area apply the reasonable person standard. *Pedersen v. United States*, 224 F.2d 212, 215 (2d Cir. 1955) presents one example. There, plaintiff was on an oil barge attached to defendant's ship. Plaintiff saw that one of the breast lines that connected the barge to the ship was chaffing on the block. Since fuel and steam lines also ran between the ship and barge, a parting of the line and separation of the vessels could have been dangerous. Plaintiff shouted to the ship for help, but to no result. He then managed to grab hold of a Jacob's ladder[13] that was hanging from the ship about eight feet above the barge deck. After plaintiff had proceeded up several rungs of the ladder, the ladder came loose from the ship and plaintiff fell. The district court held that plaintiff was contributorily negligent for failing to test the ladder before putting his weight on it. On appeal,

---

[12] New York, for example, has adopted this rule. *See Rodriguez v. New York State Thruway Auth.*, 82 A.D.2d 853 (2d Dep't 1981).

[13] "Ladder with wooden rungs, or treads, and rope sides." Layton, *supra* at 187 (cross-referencing "jack's ladder").

we applied a regular negligence standard and explained, much like the district court here, that the "emergency and possibility of harm to others were factors to be considered" in the analysis. *Id*. at 215; *see also The Cape Race*, 18 F.2d 79 (2d Cir. 1927) (applying a regular negligence standard in a maritime salvage case).

Barlow, nonetheless, argues that we adopted an "early formulation" of the rescue doctrine in *Badalamenti v. United States*, 160 F.2d 422, 426 (2d Cir. 1947). We disagree. Contrary to Barlow's claim, *Badalamenti* applied the reasonable mariner standard. In that case, a longshoreman was walking through a ship in an unlighted area when he fell through an open hatch. A second longshoreman came looking for him and also fell. We held that the second longshoreman was not contributorily negligent, even though the disappearance of his colleague gave him reason to be cautious. We quoted Judge Cardozo: "The risk of rescue, if only it be not wanton, is born of the occasion. The emergency begets the man. The wrongdoer may not have foreseen the coming of a deliverer. He is accountable as if he had." *Id*. at 426 (quoting *Wagner v. Int'l Ry. Co.*, 232 N.Y. 176, 180 (1921)). Barlow, seizing on the word "wanton," argues that in *Badalamenti* we adopted a *Furka*-like standard. He misreads the case.

19

In the sentence just before we quoted Judge Cardozo, we wrote that the facts did not suggest the plaintiff "to have been *unreasonable* or *negligent*" in proceeding to the rescue. *Id*. (emphasis added). We quoted Judge Cardozo because, as further review of *Wagner* reveals, he was applying a reasonableness standard. Judge Cardozo makes the "wanton" reference when discussing the "normal" and "probable" urge to rescue. *Wagner*, 232 N.Y. at 180. These words, associated with a reasonableness standard, reflect the actual substance of Judge Cardozo's holding. Subsequent New York courts have similarly interpreted *Wagner* as applying a reasonableness standard. *See Rodriguez*, 82 A.D.2d at 854.[14]

---

[14] We also find Barlow's reliance on New York's pattern jury instructions unpersuasive. In cases where a plaintiff has attempted the rescue of a human life, New York Civil Pattern Jury Instruction 2:41 charges the jury that:

> A person who is injured while attempting to rescue someone else from danger in an emergency is not negligent simply because the rescue attempt itself involved danger to the rescuer. The law has a high regard for human life and efforts to save it. Danger invites rescue, meaning that the impulse to respond to an urgent need for assistance, without complete regard for one's own safety, is recognized as normal. The law will not view an attempt to preserve life as negligent unless the attempt, under the circumstances, was reckless.

20

Barlow finally argues that the unique perils of life at sea favor the *Furka*

standard.  Rescues at sea are different than those on land, he argues, because

there is often no fire department or even coast guard to call.  Because deliverance

can only come from other sailors, Barlow contends, we must not hold rescuers

liable, absent recklessness, lest they hesitate.

It is true that life at sea is generally more dangerous than life on land, but

that is no reason to adopt Barlow's rule.  As this case demonstrates, unreasonable

rescues injure people just as surely as the emergency that begets them.  Barlow

would have us hold the defendant liable for injuries resulting from actions that

*no reasonable mariner* would have taken.  Indeed, under his rule, defendant would

---

New York law is, of course, not binding on us when we sit in admiralty, but even if it were, we think this instruction misstates New York law.  All but the most ancient cases cited in the jury instruction's commentary support a reasonable person standard. *See, e.g.*, *Provenzo v. Sam*, 23 N.Y.2d 256, 260 (1968) (requiring the plaintiff to "show that in attempting the rescue he acted as a reasonable man under the circumstances"); *Rucker v. Andress*, 38 A.D.2d 684, 685  (4th Dep't 1971) (asking "whether plaintiff, in going to the rescue . . . was foolhardy or reasonable in the light of the emergency confronting him . . . ."); *Tassone v. Johannemann*, 232 A.D.2d 627, 628 (2d Dep't 1996) ("There is nothing in the record to suggest that the plaintiff reasonably could have believed that" a rescue was necessary).

be liable even if no reasonable mariner would have even thought there was an emergency, let alone taken the actions Barlow did.

Of course, we should not hold rescuers to the same standard as those acting with time to plan. But the reasonable seaman standard is quite forgiving, while recognizing that mariners may have particular skills for responding to emergencies.[15] Here, the district court's instruction properly emphasized that when acting quickly and under stress, even prudent seamen will make mistakes. Under a reasonable mariner standard, a rescuer is forgiven his mistakes, because of the circumstances in which he acted. And under a comparative negligence regime, even if the rescuer acts unreasonably, he can still recover in proportion to his caution, as Barlow did here. As *Furka* admits, the rescue doctrine came from a time when the rescuer's slightest misstep could cost him any recovery whatsoever. That is no longer the case.

---

[15] We note that the district court applied the standard of a reasonably prudent *seaman*, not that of a reasonably prudent *person*. This was correct. Those with special skills are expected to use their special skills. *See Toth v. Cmty. Hosp. at Glen Cove*, 22 N.Y.2d 255, 262 (1968).

## 2. The Jury's Apportionment of Fault

Barlow also argues that, even under the district court's instruction, the jury's finding of ninety percent fault was excessive as a matter of law. This argument is easily dismissed. Barlow admits he operated the winch improperly and that this caused it to pay out. There was also evidence that Barlow was specifically ordered not to operate the winch at all because others were addressing the problem. A reasonable jury could easily have concluded that Barlow was acting contrary to orders in a way that disrupted the efforts of those in charge to safely re-moor the ship. This jury did conclude that he was thus primarily responsible for his own injuries.

## B. Unseaworthiness Claim

In admiralty, ship owners are strictly liable for injury resulting from the unseaworthiness of their vessel and the vessel's appurtenances. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960). Nonetheless, ship owners do not have a duty "to furnish an accident-free ship." *Id*. "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Id*. The liability is absolute in the sense that

23

owners may be strictly liable, but relative in the sense that seaworthiness is determined by the purpose for which the ship is used. The same vessel may be adequate sitting in port, or on a calm river, but unseaworthy if taken on a transoceanic voyage. *See Lester v. United States*, 234 F.2d 625, 628 (2d Cir. 1956).

Barlow argues that because the Liberty Sun broke free from her moorings, a presumption arises that she was unseaworthy. We disagree. In several cases where a ship – or her mooring lines – have broken, we have applied a presumption of unseaworthiness against the owners. In *Martinez v. United States*, for example, the fuel tanker, Arabian Sea, was moored in a New Hampshire river to unload jet fuel. 705 F.2d 658, 659-60 (2d Cir. 1983). She was expected to face strong currents for that stretch of river and was tied up with eighteen mooring lines, more than double her usual number. Nonetheless, all eighteen mooring lines parted and the vessel floated free. As the lines were parting, one of the ship's sailors was injured while scrambling to secure her fuel lines. He later brought suit. With respect to his seaworthiness claim, we held that "[t]he fact that the ship broke loose from her moorings raised a presumption of unseaworthiness which the defendant" could only overcome with a showing of *vis major*. *Id*. at 662. We held that the defendant had not met this burden because

"[t]he currents, even if three or four knots stronger than predicted by tables, were not so great that the vessel should not have been equipped to encounter them." *Id*.

We likewise applied this presumption in *Oliveras v. Am. Exp. Isbrandtsen Lines, Inc.*, 431 F.2d 814 (2d Cir. 1970). As the motor vessel Export Buyer rolled in "moderately heavy weather," a hatch that had been pinned open slammed shut, injuring a sailor. We held that the vessel was unseaworthy as a matter of law because "[t]here [was] no evidence that the weather conditions encountered at the time of plaintiff's injury were the least bit unusual or unexpected." *Id*. at 816. There was no evidence of any other condition that forced the hatch shut except normal North Atlantic swells. "Nothing more need be shown except that the device in question failed under conditions when it should have functioned properly." *Id*.

As these cases reflect, the fact that equipment fails is some evidence that it was unfit for the duties it was undertaking. But it is not conclusive. Forces beyond the reasonably foreseeable – *vis major* – may intervene. In both *Martinez* and *Oliveras* we presumed that the ship was unseaworthy, because the forces acting on the ship were those normally expected.

25

In this case, however, there was evidence of the unexpected. Defendants argued that the tug fending the Liberty Sun off the grain terminal gave a sudden and unexpected surge that caused the lines to part. There was evidence to support this theory.[16] By contrast, Barlow offered no evidence to support his claim that the Liberty Sun was unseaworthy other than the mere fact that the lines parted.

The fact that the lines broke is relevant to whether the ship was defective, but, given the tug's unforeseen push, it was insufficient to render the Liberty Sun defective as a matter of law. As the Seventh Circuit has explained, "[a]lthough the doctrine of unseaworthiness entails liability without fault, there must still be a defect in the vessel." *Hughes v. ContiCarriers & Terminals, Inc.*, 6 F.3d 1195, 1197 (7th Cir. 1993). The jury might have found for Barlow, but it did not. We will not disturb this finding.

---

[16] Barlow responds that since the crew knew the tug was there, it was not an *unexpected* force. It is true the tug was expected, but it does not follow that everything the tug would do was expected.

## C. Barlow's Remaining Arguments

We need not linger over Barlow's remaining contentions. First, he argues in a few conclusory sentences that the testimony of Defendants' expert should have been excluded under *Daubert*. Barlow raised this objection *in limine*, but failed to raise it at trial, and specifically withdrew his objection in his post-trial briefing. We therefore need not consider it. *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991).

Finally, Barlow asserts that it was error for the district court to fail to mention specifically in its seaworthiness instruction that mooring lines are considered part of the vessel's equipment. District courts exercise broad discretion in formulating jury instructions and we think the court's instruction was adequate. *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 106-07 (2d Cir. 2001). Since the whole case was about the mooring lines, we have no reason to think that the jury was confused.

## Conclusion

To summarize, we hold that (1) the correct standard of care in maritime injury cases is that of a reasonable mariner under the circumstances and (2) since evidence supported the conclusion that abnormal forces were acting on the Liberty Sun at the time the lines parted, she was not unseaworthy as a matter of law. We have considered Barlow's remaining arguments find them without merit.

The judgment of the district court is **AFFIRMED**.

M/V Liberty Sun

Berth: HzaMASA    Port: ITALUATUARA, BRAZIL    Tide: RWZ STAGE (Lamelless)    Date: 21 MAY 07

Load/Disch system: 2 SPouTS 75 M APART    Load/Disch rate: MAX 3000/H    Salinity: 0.996



Show pertinent information such as air draft restrictions, spouts or discharge systems, mooring points, gangway concerns, need to shift during cargo ops, etc.

A-1178

Defendant's Exhibit
For Identification    I- 10/30/2009
Reporter: May Jean Yee

29